RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0190P (6th Cir.)
File Name: 03a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*            No. 01-6382

CLARENCE D. SCHREANE,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 98-00061—Curtis L. Collier, District Judge.

Argued: May 6, 2003

Decided and Filed: June 9, 2003

Before: KRUPANSKY, SILER, and GILMAN, Circuit
Judges.

---

**COUNSEL**

**ARGUED:** R. Dee Hobbs, BELL & HOBBS, Chattanooga,
Tennessee, for Appellant. Steven S. Neff, ASSISTANT
UNITED STATES ATTORNEY, Chattanooga, Tennessee,
for Appellee. **ON BRIEF:** R. Dee Hobbs, BELL & HOBBS,
Chattanooga, Tennessee, for Appellant. Steven S. Neff,
ASSISTANT UNITED STATES ATTORNEY, Chattanooga,
Tennessee, for Appellee.

---

---

**OPINION**

---

SILER, Circuit Judge. Defendant Clarence David Schreane
was convicted of being a felon in possession of a firearm in
violation of 18 U.S.C. §§ 922(g)(1) and 924(e) and was
sentenced to a 327-month term as an armed career criminal.
He argues that his conviction cannot stand because (1) he was
denied his Sixth Amendment right to a speedy trial; (2) there
was insufficient evidence to support his conviction; and (3) he
was denied his Sixth Amendment right to confront a witness.
He does not challenge his sentence. For the reasons that
follow, we **AFFIRM**.

## I.   BACKGROUND

On December 17, 1997, Police Officer Charles Topping of
the Chattanooga Police Department received a dispatch
regarding a burglary in progress and was told to be on the
lookout for two black men in a small red car. While en route
to the scene, he observed a vehicle matching the description
of the car parked on the side of the road not far from the
location of the burglary. Two individuals were in the vehicle.

Topping pulled up behind the vehicle and noticed that the
occupants appeared to be arguing with one another.
Immediately, the driver of the car, Willard Duckett, who is
Schreane's nephew, quickly exited the vehicle and started
toward Topping while yelling, "He has a gun," referring to
Schreane, the passenger in the car. Topping drew his weapon
and advised Duckett to approach slowly. Duckett appeared
very nervous, scared, excited, and anxious to get away from
the red vehicle. In fact, Duckett almost pushed Topping down
trying to get away from the car. During this time, Duckett
was speaking with a raised high-pitch tone of voice. Topping
did not see Duckett drop or throw anything on the ground or
kick anything underneath the vehicle as he was exiting the
car.

Topping tried to calm Duckett down and brought him back to the patrol car where he searched him. While his attention was on Duckett, Topping also had to watch Schreane, who remained in the passenger side of the car. In a few minutes, Officer Ervin Morgan arrived at the scene. He was warned by Topping that "There's a gun somewhere," at which point he drew his firearm and approached the parked vehicle. As Morgan proceeded toward the passenger side of the vehicle, he saw Schreane nervously shifting around inside the car. He also observed a firearm lying on the grass beside the closed passenger door. Although Morgan initially testified that the passenger window was rolled down when he approached, he later indicated that he could not remember the position of the window. Photographs taken by crime scene investigators showed that at the time of the extraction, the window was rolled up. Neither Morgan nor Topping saw the gun in Schreane's possession.

After Schreane exited the vehicle, Morgan arrested him and placed him in the back of his patrol car. Topping then spoke with the defendant in order to obtain identifying information. Schreane asked if he could get the gun back and return it to his girlfriend, Shirley Torregano. He also stated that his girlfriend was not aware that he had her gun. Schreane further stated that the vehicle belonged to Torregano, which proved to be true. Schreane does not suggest that during his conversation with law enforcement he denied knowledge of the existence of the gun, that he accused Duckett of being the true possessor of the gun, or that he denied dropping the gun in the grass.

Torregano testified that she frequently loaned Schreane the car, but that on the day in question, she loaned the vehicle to Duckett in order for him to pick up the defendant from a bus station. She also testified that the firearm belonged to her and that she frequently kept it in her car for protection because she worked a night job in an unsafe neighborhood. According to Torregano, she told no one that she owned the firearm. At trial, the prosecution challenged her testimony regarding where she kept her firearm. It presented testimony from

Sergeant Tara Pedigo, who questioned Torregano about the firearm found at the scene. Torregano told her that she kept the gun in a box in her home. Torregano never indicated to Pedigo that she kept the firearm in her car.

The weapon located beside the vehicle was later determined to be a .38 caliber derringer loaded with two rounds of ammunition. Crime scene investigators were unable to identify any fingerprints on the firearm.

Following the police investigation, Schreane was charged by the State of Tennessee for his participation in the burglary, as well as other unrelated state crimes. He was taken into state custody pending resolution of those offenses. On July 28, 1998, while still in state custody, a federal grand jury returned an indictment charging Schreane with being an armed career criminal in unlawful possession of a firearm, violations of 18 U.S.C. §§ 922(g)(1) and 924(e). Thereafter, the United States lodged a federal detainer against Schreane on July 30, 1998, with instructions to provide a copy of the detainer to Schreane.

On November 9, 1999, Schreane pled guilty to numerous violations of state law and received a nine-year prison sentence. Following sentencing, he was transferred to a state penal institution on November 17, 1999, but the United States Marshal's Service was not notified of the disposition of his state case until July 20, 2000. When finally notified, the government immediately placed a second federal detainer, dated July 21, 2000, against Schreane. On July 27, 2000, the second detainer was personally served on Schreane, who signed for the detainer without demanding a speedy trial.

On October 17, 2000, the government filed a petition for writ of habeas corpus *ad prosequendum*, and the defendant was arraigned on the instant charges on November 15, 2000. On December 18, 2000, approximately four months and three weeks after being personally served with the second detainer, Schreane filed a motion to dismiss the indictment on speedy trial grounds. The district court denied the motion. On January 8, 2001, over two years and five months after the

indictment, Schreane's trial commenced.[1] He was convicted and subsequently sentenced to a 327-month term, to run consecutively with Schreane's nine-year state prison sentence.

## II.  ANALYSIS

### A.  *Speedy Trial*

Schreane contends that the twenty-nine month delay between his indictment and trial violated his Sixth Amendment right to a speedy trial.[2] "In determining whether a defendant's right to a speedy trial has been violated, an appeals court reviews questions of law de novo and questions of fact under the clearly erroneous standard." *United States v. Smith*, 94 F.3d 204, 208 (6th Cir. 1996) (citation omitted), *cert. denied,* 519 U.S. 1133 (1997).

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The Supreme Court has articulated four factors that must be balanced in a speedy trial analysis. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972). These factors are (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant. *Id.*; *see also Doggett v. United States*, 505 U.S. 647, 651 (1992) (restating and applying the four-factor test announced in *Barker*). This test was designed to be a "functional" one; it was formulated to deal with the "vague," "amorphous," and "slippery" nature of the right in question. *Barker*, 407 U.S. at 521-22. Thus, consistent with this inquiry, no one factor constitutes a "necessary or sufficient condition to the finding of a deprivation of the right

---

[1] His trial commenced two years, five months and eleven days after the indictment. For clarity, we refer to this delay as a twenty-nine month delay.

[2] Schreane does not allege that his rights were violated under the Speedy Trial Act, 18 U.S.C. §§ 3161-3174.

of speedy trial." *Id.* at 533. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*

### 1.  *Length of Delay*

The first factor serves a dual function. First, it is a threshold requirement; if the delay is not uncommonly long, judicial examination ceases. *See Doggett*, 505 U.S. at 652 (stating that "by definition, [a defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness"); *see also Cain v. Smith*, 686 F.2d 374, 381 (6th Cir. 1982) (explaining that the length of the delay serves as a "triggering mechanism"). Once this threshold is satisfied, this first factor must be considered as one factor among the several in the speedy trial analysis. *See Doggett*, 505 U.S. at 652. A delay approaching one year is presumptively prejudicial. *Id.* at 652 n.1. In the instant case, the district court found, and the government does not challenge, that a twenty-nine month delay is uncommonly long. Accordingly, we proceed to a full-fledged speedy trial inquiry.

### 2.  *Reason for the Delay*

The second *Barker* factor focuses on the reason for the delay. Not all delays are susceptible to equal blame. *See Barker*, 407 U.S. at 531 (explaining that "different weights should be assigned to different reasons"). Governmental delays motivated by bad faith, harassment or attempts to seek a tactical advantage weigh heavily against the government. *See id.*; *see also United States v. Marion*, 404 U.S. 307, 325 (1971) (harassment is an improper reason for delay); *United States v. White*, 985 F.2d 271, 275 (6th Cir. 1993) ("Delays intended to secure a tactical advantage weigh heavily against the government."). "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531; *see also Strunk v. United States*, 412 U.S. 434,

436 (1973) (understaffed prosecutor's office is a neutral reason for delay). A "valid reason" for a delay, such as an unavailable witness, weighs in favor of the government. *See Barker*, 407 U.S. at 531; *see also United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir.) ("Valid reasons for delaying a trial are weighted in favor of the Government."), *cert. denied*, 525 U.S. 850 (1998); *Takacs v. Engle*, 768 F.2d 122, 128 (6th Cir. 1985) (explaining that a valid delay "weighs in favor of the government").[3] Finally, it should be noted that the second *Barker* factor "is not a search for a blameless party," *Wilson v. Mitchell*, 250 F.3d 388, 395 (6th Cir. 2001); instead, the concern is with "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett*, 505 U.S. at 651.

In the instant case, nothing in the record suggests--and Schreane does not argue--that the delay that occurred in the prosecution of this case was motivated by bad faith, harassment, or a governmental desire to seek a tactical advantage. Nonetheless, Schreane contends that the government is more to blame for the delay. To properly analyze this *Barker* factor, it is necessary to separate the total twenty-nine month delay into two time periods. The first time period is the fifteen and one-half month delay between federal indictment and imposition of Schreane's state sentence. The second consists of all time periods subsequent to Schreane's being sentenced in state court. This separation is necessary because the reason for the delay in each of the time periods favors a different party, with the first weighing in favor of the government and the second in favor of the defendant. Therefore, based on our *ad hoc* analysis, *see Barker*, 407 U.S. at 530 (explaining that a balancing test "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis"), the

---

[3] Determining that there exists a valid reason for the government's delay does not prevent a finding that a defendant's right to a speedy trial has been violated. *See Grimmond*, 137 F.3d at 828 n.3. A speedy trial analysis requires a balancing of all four of *Barker's* factors. *See Barker*, 407 U.S. at 533 (explaining that all four factors "must be considered together").

second *Barker* factor essentially favors no one. That is, neither party is really "more to blame" for the total delay in the prosecution of this case. *See, e.g., United States v. O'Dell*, 247 F.3d 655, 671 (6th Cir. 2001) (explaining that based on the facts of the case, the "Defendant's culpability with respect to delay is at least equal to that of the government. Thus, neither party is completely free of blame for the ensuing delays.").

The first delay in this case was approximately fifteen and one-half months, and it spanned from July 28, 1998, when a federal grand jury returned an indictment, to November 9, 1999, when Schreane was sentenced in state court. This delay was due to the obvious need to allow the defendant to be prosecuted by the State without interference by the federal government. "When a defendant violates the laws of several different sovereigns, as was the case here, at least one sovereign, and perhaps more, will have to wait its turn at the prosecutorial turnstile." *Grimmond*, 137 F.3d at 828. Customarily--although certainly not always--the jurisdiction with custody of the accused, in this case the State of Tennessee, is afforded the first opportunity to prosecute the defendant. This longstanding practice is rooted in the respect accorded to a custodial sovereign to resolve its criminal proceedings before relinquishing custody to another jurisdiction. This practice also can be understood in terms of the orderly and efficient prosecution of cases in our dual system of criminal justice.

As the Fourth Circuit has explained, to require the federal government to prosecute an accused before state proceedings have run their course "would be to mire the state and federal systems in innumerable opposing writs, to increase inmate transportation back and forth between the state and federal systems with consequent additional safety risks and administrative costs, and generally to throw parallel federal and state prosecutions into confusion and disarray." *United States v. Thomas*, 55 F.3d 144, 150-51 (4th Cir.), *cert. denied*, 516 U.S. 903 (1995). Moreover, "if the government must prosecute the defendant without knowing what his

punishment will be at the state level, it will be unable to consider the state's punishment in determining what charges to bring [--if any at all--as well as what punishment to seek] to make the totality of the state and federal convictions [and punishments] commensurate with the crime." *Id.* at 150 n.6. Thus, "[s]imply waiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay" that weighs in favor of the government. *Grimmond*, 137 F.3d at 828; *see also United States v. LaBorde*, 496 F.2d 965, 968 (6th Cir. 1974) (per curiam) (reversing the district court's dismissal of an indictment and holding that a twenty-one month delay did not violate a defendant's right to a speedy trial because in addition to the neutral reason of an overcrowded docket, the federal district court relinquished custody of the accused to another jurisdiction in order for the defendant to stand trial in that jurisdiction). To so hold does not suggest "that a pending state prosecution in any sense tolls the running of the Sixth Amendment period of delay"; rather, it should be understood as "a factor in the government's favor, to be weighted in considering the length of the delay, the prejudice to the accused, and the accused's assertion of right." *Thomas*, 55 F.3d at 151. Accordingly, in this case, the federal government's patience in allowing the State of Tennessee to finish prosecuting Schreane is a valid reason for delay that weighs in favor of the government.

The remaining thirteen and one-half month delay, which consists of all time periods after Schreane was sentenced in state court on or about November 9, 1999, was caused by a combination of reasons, which, when considered as a whole, weigh in favor of the defendant. These reasons include (1) the State's apparent failure to notify the defendant of the first federal detainer;[4] (2) the State's apparent failure to notify

---

[4] Although the district court found that Schreane was "informed" of the charges against him when the first detainer was lodged, there appears to be nothing in the record that supports this factual finding. An evidentiary hearing was not held on the issue and the defendant specifically challenges this finding on appeal. We need not determine whether this finding was clearly erroneous, however, because we assume

the United States of the disposition of the defendant's case until eight and one-half months after the fact; (3) the federal prosecution's failure to follow-up on the status of the defendant's state proceedings for approximately eight and one-half months (from November 9, 1999, when the defendant was sentenced in state court to July 20, 2000, when state authorities finally notified the United States of the disposition of his state case); (4) the federal government's failure to move forward with its prosecution of the defendant during the nearly five and one-half month period between when the second detainer was lodged and when the defendant's trial commenced on January 8, 2001; and (5) the defendant's failure to invoke his speedy trial rights following receipt of the second federal detainer, which we discuss and weigh separately below in the third *Barker* factor despite its clearly contributing to the delay. Although neither party should be penalized by the first and second considerations as they appear to be the result of the State's failure to properly handle the federal detainer,[5] the third and fourth reasons weigh in favor of the defendant.

The federal government was in a position to check on the status of the defendant's state proceedings, but failed to do so.

---

for purposes of this claim that Schreane is correct that he did not have actual notice of this first detainer.

[5] Negligence on the part of the government, overcrowded courts or understaffed prosecutor offices are examples of "neutral" reasons for delay that should weigh against the government. *See Barker*, 407 U.S. at 531; *Strunk*, 412 U.S. at 436. In all three examples, fault can be attributed to the actions or omissions of the prosecuting government or otherwise to a deficiency in the criminal system itself. In the instant case, the failure to provide notification to the defendant was not the result of governmental error or inadequacies in the federal criminal system; rather, the error stemmed from the State's apparent failure to properly handle the detainer. Likewise, the State appears to be at fault in waiting eight and one-half months to notify federal authorities of the resolution of the defendant's case, despite an expectation that it would do so promptly after the state proceedings were completed. Thus, because both parties appear to have clean hands with regard to the first and second reasons for delay, the State's mistakes will not be factored against either party.

Although the government may have reasonably expected that the State would promptly notify it of the defendant's availability, when the government failed to receive any notice after the passage of a considerable period of time, reasonable diligence requires the government to follow-up on the matter. *See Redd v. Sowders*, 809 F.2d 1266, 1269 (6th Cir. 1987) (explaining that the "[t]he prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner") (citations omitted); *see also Payne v. Rees*, 738 F.2d 118, 122-23 (6th Cir. 1984) (finding that a jurisdiction has the responsibility to "mov[e] toward a reasonably prompt disposition of [an] indictment" even "where a defendant is incarcerated in another jurisdiction on pending charges"). Failure to do so places "more blame" on the government. *See Dickey v. Florida*, 398 U.S. 30, 37-38 (1970) ("Although a great many accused persons seek to put off the confrontation as long as possible, the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial."). Also, the record is silent on why there was a nearly five and one-half month delay between service of the second detainer and commencement of trial. Because the government has failed to explain--or even address this delay--we attribute this delay to the government. *See Redd*, 809 F.2d at 1269 ("Unexplained delay is weighted against the prosecution.") (citations omitted).

In sum, although not an exact science, based on the circumstances of this case, each of the two roughly equivalent time periods in the twenty-nine month delay favors a different party. Thus, neither party is really "more to blame" for the total delay in this case. *Cf. O'Dell*, 247 F.3d at 670-71 (explaining that "any delay attributable to the government is balanced by Defendant's own strategic machinations"). Consequently, under our *ad hoc* analysis, the scales of justice remain more or less in equipoise when balancing this *Barker* factor. The scales tip against Schreane, however, once we consider that he failed to timely assert his speedy trial rights after receiving notice of his second federal detainer, one of

the reasons we have already identified as contributing to the delay.

### 3.   *Defendant's Assertion of his Speedy Trial Rights*

Turning to the third factor of the *Barker* test, Schreane argues that because he did not know of his federal indictment before he was served with the second detainer on July 27, 2000, he could not have demanded a speedy trial any time before that date. To this argument, the government offers nothing in response. Accordingly, the defendant cannot be blamed for not invoking his right to a speedy trial before July 27, 2000. *See United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999) (explaining that a defendant should not be penalized for not invoking his speedy trial rights when the government has not presented sufficient proof that the accused "knew" he had been indicted); *United States v. Mundt*, 29 F.3d 233, 236 (6th Cir 1994) (declining to draw the inference that the defendant knew of his indictment prior to his arrest, and finding that a defendant's failure to assert his right cannot be held against him when the government presents insufficient evidence of the defendant's knowledge of the indictment).

Schreane concedes, however, that following the second detainer, he did not assert his right to a speedy trial in a timely fashion. As Schreane acknowledges, he "never invoked his right to a speedy trial . . . until December 18, 2000," when defense counsel filed a motion to dismiss the indictment less than one month before trial. Schreane's four-month and three-week delay in invoking his speedy trial right weighs against him. *See Wilson*, 250 F.3d at 396 (explaining that the third factor in a speedy-trial analysis calls on courts "to determine whether the defendant *timely* asserted his Sixth Amendment rights") (emphasis added). However, the weight we assign to this prong is proportional to the tardiness at issue, which is but a portion of the total delay. Of course, if Schreane had known of his indictment at the time the first federal detainer was lodged, then this third *Barker* factor would weigh heavily against him. *See Barker*, 407 U.S. at

529, 532 (noting that courts are free to "weigh the frequency and force of the objections" and emphasizing that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial"); *United States v. Thomas*, 167 F.3d 299, 305 (6th Cir. 1999) ("A defendant's failure to assert his rights in a timely fashion weighs heavily against his Sixth Amendment claim.").

### 4.   *Prejudice*

The last *Barker* factor is concerned with the prejudice suffered by Schreane.   A defendant must show that "substantial prejudice" has resulted from the delay. *White*, 985 F.2d at 276 (quoting *United States v. DeClue*, 899 F.2d 1465, 1470 (6th Cir. 1989)).   The Supreme Court has identified three relevant forms of prejudice in speedy trial cases:  (1) "oppressive pretrial incarceration"; (2) "anxiety and concern of the accused"; and (3) "'the possibility that [the accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. 514 at 532) (alteration in original). "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

In the instant case, Schreane alleges that he has suffered only from the third form of prejudice.  Specifically, he argues that the arresting officers' testimony was cloudy on certain facts; that his girlfriend's testimony was unfairly undermined by a rebuttal witness who was allowed to refer to investigatory notes; that his partner in crime, Duckett, was missing during trial; that his own memory of events had dimmed twenty-nine months after the fact; and that there may have been a loss of exculpatory evidence completely unknown to the defense. Based on the record before us, these alleged prejudices fall far short of showing that Schreane's defense was somehow impaired by the delay that occurred in the prosecution of this case.

Contrary to Schreane's assertion, the inability of Officers Topping and Morgan to remember particular facts, such as the

presence of plastic gloves found outside of the driver's side of the car[6] and whether the passenger window was rolled down during the arrest, did not undermine his defense; rather, it weakened the prosecution's case.  As the Supreme Court has observed, "[a]s the time between the commission of the crime and the trial lengthens, witnesses may become unavailable or their memories may fade.  If the witnesses support the prosecution, its case will be weakened . . . [as] it is the prosecution which carries the burden of proof." *Id.* at 521. Thus, the partial memory lapses of the prosecution's key witnesses, which defense counsel was free to highlight during trial, worked to the advantage of Schreane.

Next, Schreane argues that he was prejudiced because Sergeant Pedigo, who was called to rebut Torregano's testimony, was permitted to refer to investigatory notes of an initial interview with Torregano in which Torregano made inconsistent statements with her trial testimony.  Schreane argues that Pedigo's testimony made Torregano look as if she was lying when she was just suffering from a memory lapse. This argument is wholly meritless.  Regardless of when a jury is empaneled for speedy trial purposes,  as a matter of evidentiary law, a party is free to challenge a trial witness's testimony with prior inconsistent statements. *See United States v. McCall*, 85 F.3d 1193, 1196-97 (6th Cir. 1996) (no abuse of discretion where prosecution used rebuttal witness to impeach defense witness testimony and defendant elected not to call a surrebuttal witness).  To do so does not "prejudice" the defendant under the Sixth Amendment right to a speedy trial.

Schreane also argues that the lapse in time between his indictment and trial resulted in Duckett's "untimely absence."

---

[6]Although Schreane states that the plastic gloves were possibly exculpatory pieces of evidence, he has failed to show how the existence and location of these gloves somehow proves that he was not the possessor of the gun.  Moreover, if these gloves were as important as Schreane makes them out to be, defense counsel was free to focus the jury's attention on this evidence at trial.

However, a writ of habeas corpus *ad testificandum* was issued for Duckett prior to trial, and he was brought to a local jail two days before the trial began. If Schreane wished to call Duckett to testify he was free to do so. Yet, "[p]resumably[,] only those declarants that neither side believes will be particularly helpful will not have been subpoenaed as witnesses" or called to testify once made available. *United States v. Inadi*, 475 U.S. 387, 397 (1986). Thus, Duckett's "unavailability," which must have been part of Schreane's trial strategy, is hardly evidence of prejudice.

Finally, Schreane argues that the delay in this case dimmed his memory of events relevant to his defense and possibly resulted in the loss of unknown exculpatory evidence. Essentially, this is an argument that the delay of this case should in and of itself create a presumption of prejudice that weighs in favor of the defendant.[7] *See Doggett*, 505 U.S. at 655-56. ("[A]ffirmative proof of prejudice is not essential to every speedy trial claim . . . . [E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or, for that matter, identify."). However, the presumption of prejudice discussed in *Doggett* is not automatically triggered whenever an accused's trial is delayed. *See United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000). Instead, "[w]hen a defendant is unable to articulate [or demonstrate] the harm caused by delay, the reason for the delay (factor 2) will be used to determine whether the defendant was presumptively prejudiced." *Mundt*, 29 F.3d at 236.

If "the government prosecutes a case with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay." *Howard*, 218 F.3d at 564. When there is evidence of

---

[7]Of course, "presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria[;] . . . it is part of the mix of relevant facts, and its importance increases with the length of the delay." *Doggett*, 407 U.S. at 655-56.

negligence on the government's part, but no bad faith, judicial "toleration of such negligence varies inversely with its protractedness." *Doggett*, 505 U.S. at 657. That is, "[t]o warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." *Id.* Of course, "in calculating the length of the delay, only those periods of delay attributable to the government or the court are relevant to [the] . . . constitutional claim." *Howard*, 218 F.3d at 564 (citations omitted). Based on the facts and circumstances of this case, the portion of the delay attributable to the government's negligence, which is at most thirteen and one-half months, does not give rise to a presumption of prejudice. *See, e.g., Zerla v. Leonard*, 37 Fed. Appx. 130, 132 (6th Cir. 2002) (unpublished opinion) (no presumption of prejudice when delay was slightly longer than one year), *cert. denied,* --- U.S. ---, 123 S.Ct. 1787 (2003); *Thomas*, 167 F.3d at 305 (twenty-nine month delay in re-sentencing not per se unreasonable); *United States v. Cook*, 181 F.3d 104, ** 3 & n.3 (6th Cir.) (per curiam) (unpublished opinion) (sixteen months not presumptively prejudicial), *cert. denied,* 528 U.S. 942 (1999). When prejudice has been found, the government's delay has typically been shockingly long. *See, e.g., Doggett*, 505 U.S. at 657 (six years); *Brown*, 169 F.3d at 351 (five and one-half years); *United States v. Graham*, 128 F.3d 372, 376 (6th Cir. 1997) (eight years).

In sum, after balancing the four *Barker* factors, only the first factor weighs in favor of Schreane, with the second favoring neither party, and the third and fourth weighing against the defendant. Considering all the factors as a whole, we find that Schreane's Sixth Amendment right to a speedy trial was not violated.

## B.    *Sufficiency of the Evidence*

Schreane argues that there was insufficient evidence to support his conviction of being a felon in possession of a firearm in violation of 18 U.S.C. §922(g). We review a claim of insufficient evidence using the same standard as the district

court. *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir.1992). "In undertaking this analysis, this court neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir.) (citations omitted), *cert. denied*, 526 U.S. 1137 (1999). "A court properly denies a challenge to the sufficiency of the evidence where 'after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). In the instant case, there is sufficient evidence for Schreane's conviction to stand.

"To obtain a conviction pursuant to § 922(g)(1), the government must prove beyond a reasonable doubt: (1) that the defendant has a prior conviction for a crime punishable by imprisonment for a term exceeding one year; (2) that the defendant thereafter knowingly possessed the firearm and ammunition specified in the indictment; and (3) that the possession was in or affecting interstate commerce." *United States v. Daniel*, 134 F.3d 1259, 1263 (6th Cir. 1998) (internal quotation marks omitted), *cert. denied*, 525 U.S. 830 (1998). On appeal, Schreane does not dispute that the gun and ammunition affected interstate commerce nor does he dispute that he had a prior felony conviction at the time he was alleged to have possessed the firearm. Thus, the element of possession is the only issue in dispute.

Actual or constructive possession is sufficient to give rise to criminal liability under § 922(g). *United States v. Murphy*, 107 F.3d 1199, 1207 (6th Cir. 1997). "Both actual and constructive evidence may be proved by circumstantial evidence." *Id.* at 1208 (citation omitted).

Although Schreane did not have physical possession of the gun at the time of his arrest, there was ample evidence from which the jury could infer that he knowingly possessed the weapon immediately prior to when Officer Morgan approached the vehicle. Schreane principally challenges two

pieces of evidence introduced by the government. First, he contends that Duckett's statement, "He has a gun," was "blatantly false" and "clearly . . . self-serving" because "[b]y the time Duckett approached Officer Topping, the firearm must have already been outside of the car."[8] According to Schreane, "[a]ssuming that the gun must have been placed outside of the car before either officer arrived on the scene . . . Duckett's statement . . . could have shed no credible light on who exercised dominion and control over the Derringer." Second, Schreane contends that his self-incriminating statements regarding his possession of the gun and his desire to return it back to his girlfriend were unclear and open to interpretation. We disagree on both points.

When Officer Topping first pulled behind the vehicle in question, he observed the two passengers arguing. Immediately, Duckett, who was the driver of the vehicle, darted out of the car and headed toward the officer exclaiming, "He has a gun!"[9] Topping described Duckett as being in a genuine state of panic, specifically describing him as very "nervous," "scared," "excited," and anxious to "get away from the vehicle." As Topping was distracted with Duckett, both trying to calm him down and conduct a pat-down search, the jury could have reasonably inferred that the defendant wiped the gun of his fingerprints and furtively

---

[8] Although Schreane challenges the introduction of this statement, as discussed *infra*, the district court did not err in allowing the jury to learn of this excited utterance.

[9] During the prosecution's opening statement, the jury heard Duckett's full statement, namely, "You've got to help me. He's got a gun. He's going to kill me. Put me in the car. Arrest me. Take me away. He's got a gun." At the conclusion of opening statements, the defense moved for a mistrial, which was denied. The district court, however, instructed the jury to disregard the prosecutor's additional statements and not to consider those statements as evidence. On appeal, Schreane repeatedly refers to the prosecution's statements to suggest prosecutorial misconduct. Pursuant to our holding in *United States v. Bess*, 593 F.2d 749, 756-57 (6th Cir.1979), however, any alleged prosecutorial error did not deny the defendant his constitutional right to a fair trial.

cracked open the passenger door or rolled down the passenger window (assuming the window was rolled up) and dropped the weapon in the grass before Officer Morgan arrived on the scene. Because Topping was preoccupied with Duckett while standing on the driver side of his patrol car and behind the suspects' vehicle, the jury could have reasonably inferred that from his poor vantage point, Topping would have had difficulty detecting any surreptitious activity on the part of Schreane. Thus, contrary to Schreane's assertion, there was sufficient evidence from which the jury could infer that he dropped the gun that was within his exclusive possession *after* Officer Topping arrived on the scene.

When Officer Morgan arrived as backup, he testified that he observed the defendant moving about inside the car, which the jury could have reasonably inferred meant that the defendant was fiddling with the lever of the car window or the inside door handle. As Morgan approached the vehicle to extract the defendant, he discovered the gun in the grass next to the side door of the vehicle. Because the gun was later determined to be owned by Torregano--and not just a random gun lying around in the street coincidentally located in the grass next to where Duckett decided to park the car--clearly the defendant or Duckett had dominion and control over the firearm and dropped it outside. Officer Topping testified that when Duckett exited the vehicle, Duckett did not throw anything outside the car or attempt to kick anything underneath the vehicle. In fact, Topping testified that because of the speed with which he exited the car, Duckett did not even have the opportunity to do so. Thus, the jury was justified to infer that Schreane, who was in close proximity to the discovered weapon, was in possession of the gun and decided to drop it outside.

Furthermore, Schreane does not deny that when he was placed in the back of the police cruiser, he asked Officer Topping if he could get the gun back and return it to his girlfriend. He also does not deny that he stated that his girlfriend was not aware that "he has it [i.e., the gun]," a clear admission that the firearm was in his immediate possession

and that he exercised dominion and control over it before it was dropped on the ground. Viewing the evidence in the light most favorable to the prosecution, it is quite clear that the jury could have reasonably interpreted Officer Topping's testimony to be that while in the cruiser, Schreane admitted to having been in possession of the gun and that his girlfriend was unaware that he had it.[10]

Moreover, although Torregano provided an innocent story to explain the presence of the firearm, namely, that she frequently kept the gun in her car for protection because she had a night job in an unsafe neighborhood,[11] the government rebutted this testimony with testimony from Sergeant Pedigo, who asserted that during the police investigation, Torregano stated only that she kept the gun in a box in her home. It is well settled that when a defendant "offer[s] an innocent explanation for the incriminating facts proved by the government, the jury [i]s free to disbelieve [it]." *United States v. Ledezma*, 26 F.3d 636, 641 (6th Cir. 1994), *cert. denied*, 513 U.S. 942 (1994). "It is for [the jury] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *United States v. Bailey*, 444 U.S. 394, 414-15 (1980).

Finally, for purposes of comparison, the facts of this case are similar to *United States v. Daniel*, 134 F.3d 1259 (6th Cir. 1998), where we upheld a jury's verdict of guilt. In *Daniel*, the defendant was a passenger in an automobile that was stopped by law enforcement. During the stop, the driver of the automobile informed police that the defendant was in possession of a firearm. Police found shotgun shells in the defendant's pants pocket and a shotgun underneath the passenger seat in which the defendant had been sitting. At

---

[10]Schreane complains that Officer Topping "did not elaborate on his statement." We note, however, that through effective cross-examination, defense counsel could have sought any such "elaboration."

[11]This testimony, however, does nothing to explain how the gun made its way to the grass outside the car.

trial, the defendant denied being in possession of the shotgun and alleged that earlier in the day, the driver must have-- unbeknownst to the defendant--stealthily placed the shells in his pocket. *Id.* at 1263. In finding there was "ample" evidence for the jury to return a conviction, this court pointed to, among other things, the driver's direct statements implicating the defendant as being in possession of a gun, law enforcement testimony that the defendant was "doing something underneath the seat," the defendant's on-the-scene admission that the shells were for a different gun he had at home (as a convicted felon, the defendant was not permitted to possess any firearm), and the defendant's failure during the stop to accuse the driver of being the true possessor of the gun. *Id*. at 1264.

In sum, when viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence for a reasonable jury to return a guilty verdict on the indictment of being a felon in possession of a firearm.

## C.   *Right to Confront a Witness*

Schreane next argues that the district court erred in allowing Officer Topping to testify that during the stop Duckett exclaimed, "He has a gun," referring to Schreane. He contends that the admission of this statement under the hearsay exception of excited utterances deprived him of his constitutional right to confront a witness. The district court did not abuse its discretion in admitting Duckett's statement as an excited utterance, and the admission of this statement did not violate the Confrontation Clause of the Sixth Amendment.

Schreane does not address whether Duckett's statement qualifies as an excited utterance; instead, he seems to argue that regardless of whether Duckett was under the stress of excitement, the district court should have rejected the introduction of Duckett's spontaneous statement because it was a statement made by a co-defendant who "had a strong interest in shifting at least some of the responsibility for the burglary from himself onto [the defendant]." The flaw of this

assignment of error is that it fundamentally misunderstands longstanding jurisprudential insight that excited utterances--in and of themselves and regardless of the source--contain "inherent guarantees of truthfulness," *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983), *cert. denied,* 464 U.S. 1071 (1984), that render adversarial testing unnecessary and thus satisfy the requirements of the Confrontation Clause. *See Idaho v. Wright*, 497 U.S. 805, 820 (1990).

An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). The rationale for this hearsay exception is that "such statements are given under circumstances *that eliminate the possibility of fabrication, coaching, or confabulation*, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous." *Wright*, 497 U.S. at 820 (citations omitted) (emphasis added); *see also Haggins*, 715 F.2d at 1057 (explaining that the "assumption underlying [the excited utterance] exception is that a person under the sway of excitement precipitated by an external startling event will be bereft of the reflective capacity essential for fabrication and that, consequently, any utterance he makes will be spontaneous and trustworthy") (alteration in original) (internal quotation marks and citation omitted). Thus, contrary to Schreane's assertion, the dispositive inquiry we must make is not whether Duckett had a "motive" to shift criminal liability to the defendant, but whether Duckett's statement was made under genuine conditions of excitement that removed the elements of reflection and contrivance from his words.[12] *See United States v. Tocco*, 135 F.3d 116, 127-

---

[12]Schreane's heavy reliance on *Bulls v. Jones*, 274 F.3d 329 (6th Cir. 2001), and *United States v. McCleskey*, 228 F.3d 640 (6th Cir. 2000), is misplaced. Both *McCleskey* and *Bulls* involved the admission of custodial-interrogation-accomplice statements that were introduced against criminal defendants without the benefit of cross-examination. In

28 (2d Cir.) (finding that an accomplice's statement inculpating a defendant in an arson was properly admitted as an excited utterance regardless of the accomplice's participation in the crime), *cert. denied,* 523 U.S. 1096 (1998).

If Duckett's statement qualifies as an excited utterance, which necessarily means that it carries sufficient indicia of reliability and trustworthiness, then the judicial inquiry is at an end. A criminal defendant's right to confront witnesses is not violated by the introduction of hearsay testimony where either the hearsay statement "falls within a firmly rooted hearsay exception," or where it is supported by "a showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). The excited utterance exception, which is at least two centuries old and may in fact have its origins in late 17th century English common law, is without question a firmly rooted hearsay exception. *See White v. Illinois*, 502 U.S. 346, 356 n.8 (1992) (citing *Thompson v. Trevanion*, 90 Eng.Rep. 179 (K.B. 1694)).

An appellate court reviews all evidentiary rulings-- including constitutional challenges to evidentiary rulings--

---

both cases, we explained that "Supreme Court Confrontation Clause jurisprudence does not permit the introduction of hearsay declarations uttered by accomplices in law enforcement custody that inculpate a defendant, absent further 'particularized guarantees' of the declaration's trustworthiness." *Bulls*, 274 F.3d at 334 (quoting *McCleskey*, 228 F.3d at 644). It was this court's view that "because of the incentive brought to bear upon such an accomplice to shift and spread blame to other persons, such a confession" lacks "guarantees of trustworthiness sufficient to rebut its presumptive unreliability." *McCleskey*, 228 F.3d at 644-45. Neither *McCleskey* nor *Bulls* involved excited utterances, which are judicially accepted to be given under circumstances that "eliminate the possibility of fabrication, coaching or confabulation. . . ." *Wright*, 497 U.S. at 820. The case at hand does not involve a situation where Duckett was interviewed by law enforcement for some period and then made statements inculpating the defendant, or had time potentially to contrive a story shifting blame to the defendant. The risks of fabrication and unreliability present in *McCleskey* and *Bulls* are not present in this case. Accordingly, both cases are inapplicable to our analysis.

under the abuse-of-discretion standard. *See General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997) (stating that "[a]ll evidentiary decisions are reviewed under an abuse-of-discretion standard"). An abuse of discretion will be found upon a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Super Sulky, Inc. v. United States Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir.) (internal quotation marks and citation omitted), *cert. denied,* 528 U.S. 871 (1999).

In *Haggins*, we held that a statement qualifies as an excited utterance if three elements are met. First, "there must be an event startling enough to cause nervous excitement." 715 F.2d at 1057. Second, the statement "must be made before there is time to contrive or misrepresent." *Id.* Third, the statement "must be made while the person is under the stress of the excitement caused by the event." *Id.* For purposes of determining spontaneity, "[t]estimony that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing [to be] emotional[ly] upset will often suffice." *Id.* at 1058 (internal quotation marks and citation omitted). In the instant case, as Schreane himself appears to concede, the record amply supports a finding that Duckett's statement fell within the excited utterance exception.

On the first element, Officer Topping observed Duckett and Schreane arguing in the car immediately after they had committed a burglary, a crime to which the defendant pleaded guilty in state court. Certainly, the burglary itself may constitute a startling event, but even if it did not, the subsequent verbal altercation between Duckett and Schreane (one where Schreane apparently threatened to use the gun on Duckett) qualifies as a startling event. Second, immediately upon observing the patrol car, Duckett jumped out of the vehicle and quickly approached Topping, yelling "He has a gun!" The short length of time between the burglary and the statement, and/or the argument and the vocalization, did not afford Duckett enough time to contrive a story for the

officer's benefit.[13]  Last, Topping described Duckett as being genuinely "nervous," "scared," "excited," eager to "get away from the vehicle," speaking in a "high-pitched voice" and in need of being "slowed down."  Duckett's excited physical demeanor supports a finding that Duckett made his statement while still under the sway of excitement.  Accordingly, the district court did not abuse its discretion in admitting Duckett's statement as an excited utterance, and, as a firmly rooted exception to the hearsay rule, the statement did not violate the Confrontation Clause.[14]

AFFIRMED.

---

[13]Even if Duckett had a "motive" to shift responsibility for the burglary, Duckett's statement did not concern the burglary, but rather, the defendant's apparent threat to use the firearm against Duckett.  The statement's focus on the gun instead of the burglary is further proof that Duckett was reacting to a startling event and was not fabricating a story to escape criminal responsibility.

[14]As indicated *supra*, although the defendant complains that he was denied the opportunity to subject Duckett to "intense cross-examination," the record shows that Duckett was produced by the government and made available to the defense.