NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0376n.06

No. 06-1760

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**May 27, 2009**
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JAMES ROY SYLVESTER, JR.,

     Defendant-Appellant.

_____/

On appeal from the United States
District Court for the Eastern District
of Michigan

BEFORE:    RYAN, GIBBONS, and SUTTON, Circuit Judges.

     RYAN, Circuit Judge.     James Roy Sylvester, Jr., challenges his conviction for various offenses related to his drug trafficking operation, including possession with intent to distribute cocaine, marijuana, and various other controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 844(a), and 846, and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(c).  Sylvester claims that an incriminating statement he made to police officers following his arrest was coerced and that his statutory and constitutional rights to a speedy trial were violated.  We find no basis for disturbing the district court's judgment, and we affirm.

**I.**

     As early as 2001, Sylvester arranged to bring large quantities of cocaine and other controlled substances from California to Michigan.  Sylvester recruited Jose Escobar and Vicky Loos to take Greyhound buses to California, pick up suitcases full of narcotics from

Calvin Ayers and Frederick Wyatt, and bring them to Sylvester in Saginaw, Michigan. They made at least four such trips.

On February 24, 2003, during one of the trips, Nebraska state investigators noticed suspicious suitcases belonging to Escobar and Loos in the checked baggage at an Omaha bus station. Sylvester's name tags were on the cases and, inside, investigators found a total of five kilograms of cocaine.

Loos agreed to cooperate with authorities by participating in a controlled delivery of the cocaine to Sylvester in Saginaw. On February 25, 2003, Loos returned to Michigan, met Sylvester at a Saginaw bus station, and delivered the drugs to him. Drug Enforcement Administration (DEA) agents promptly arrested Sylvester and took him to a local Saginaw police station. Other agents then planned to take Loos to her residence in Saginaw and, with her consent, conduct a search of her house.

While booking Sylvester at the police station around 9:30 a.m., DEA agents found ten grams of cocaine in his pants pocket. Meanwhile, when Loos and her accompanying officers arrived at Loos's house, two individuals who apparently expected to find Sylvester, Loos, and Escobar returning from the bus station, ambushed Loos and the officers. A shoot-out ensued in which both ambushers were killed and two police officers were wounded. The officers at the scene called for help from the DEA agents who were with Sylvester at the police station.

An emergency rescue team raced to Loos's house, while agent Bruce Osterhagen stayed behind with Sylvester to complete the booking process. Around 10:00 a.m., Osterhagen decided he was needed to coordinate the emergency at Loos's residence, so he placed Sylvester in a temporary detention room. He handcuffed one of Sylvester's

hands to a bench, intending to return shortly to question him. Osterhagen testified that while coordinating the emergency response efforts at Loos's house, he continually checked on Sylvester to see if he needed water, a rest room break, or anything else.

At about 2:30 p.m., Osterhagen brought Sylvester out of the holding cell and placed him in an interrogation room. During the interview that followed, Sylvester stated that over the previous several years, he had purchased approximately nine kilograms of cocaine in California for shipment to Michigan, including the five kilos seized at the Omaha bus station. He admitted selling crack cocaine to Loos, and identified two other co-conspirators by their street names. When Osterhagen began to question Sylvester about the ambush at Loos's house, Sylvester terminated the interview.

On February 25 and 26, 2003, DEA agents executed a search warrant at the home Sylvester occupied with his mother, Corine, and found: several firearms and ammunition, including a stolen 9 mm semi-automatic handgun; 187.4 grams of marijuana; drug paraphernalia; 46 unidentified bottles of various prescription drugs; $11,600 in cash; and financial records. In a search of Corine's automobile, they found a bag containing $41,040 in cash, as well as records noting large amounts of money (over $50,000) deposited and then withdrawn from Corine and Sylvester's joint safety deposit box.

On February 26, 2003, a federal grand jury handed down an indictment against Sylvester, charging him with two counts: possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii)(II); and possession with intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii). Between February 2003 and January 2005, eight superseding indictments issued, adding three additional codefendants, Calvin Ayers, Corine Sylvester,

and Frederick Wyatt.  The final indictment charged Sylvester with thirteen counts related to drug trafficking and firearm possession.

On February 5, 2004, Sylvester filed a motion to suppress the statements he made to officers during his post-arrest interview, and on April 28, 2004, after a hearing, the district court denied the motion, holding that Sylvester's statements were voluntary.  On November 19, 2004, Sylvester filed a motion to dismiss the charges against him due to pretrial delay and, after a hearing, the district court denied the motion.

All of the defendants except James Sylvester entered into plea agreements and Sylvester's jury trial began on September 13, 2005.  On September 21, 2005, the jury returned a guilty verdict against Sylvester on twelve counts and, in due course, the district court sentenced him to 35 years' imprisonment.  Sylvester has appealed.

## II.

Sylvester argues that the district court erred in denying his motion to suppress certain post-arrest statements because, he claims, the statements were involuntary in that they were made after Sylvester was kept handcuffed in a holding cell for five hours.

In "reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo," considering "the evidence in the light most favorable to the government." United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006) (first internal quotation marks and citation omitted).

We have established three requirements that must be met for finding a confession involuntary due to police coercion:  "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the

statement." United States v. Johnson, 351 F.3d 254, 260 (6th Cir. 2003) (internal quotation marks and citation omitted). These factors are analyzed using a totality of the circumstances approach, and the government bears the burden of proving by a preponderance of the evidence that the confession was voluntary. Id.

Sylvester testified that he "felt threatened" by the agents because, after being locked in a holding cell for five hours, he felt a lot of "tension" in the room when the officers spoke to him with "intensity." According to Sylvester, the agents further coerced him by showing him a newspaper report of the police shooting at the Loos house.

We think the district court properly held that Sylvester's statements to the DEA agents were voluntary. Under the totality of the circumstances, there is no evidence of police coercion. Agent Osterhagen placed Sylvester in a holding cell for several hours while he coordinated the police response to the emergency situation at Loos's house. He was not questioned during that time and agent Osterhagen testified that he checked on Sylvester regularly to ask if he wished to use the rest room or needed anything. The district court found that Sylvester made his incriminating statements after receiving the usual Miranda warnings and before agents showed him the newspaper story. There is no evidence of objective coercive policy activity; Sylvester cannot show that his will was overborne, or that any police misconduct motivated him to make his incriminating statements. Therefore, we hold that the district court properly denied Sylvester's motion to suppress.

**III.**

More troublesome is Sylvester's argument that his right to a speedy trial, as guaranteed by the Speedy Trial Act of 1974 (STA), 18 U.S.C. § 3161, et seq., was violated

because he was not brought to trial for more than two and one half years after his first court appearance. Sylvester focused his argument on the time period between his first court appearance and codefendant Ayers's first court appearance after the issuance of the superseding indictment adding Ayers as a defendant. The district court held there was no Speedy Trial Act violation.

The problem with this argument is that the defendant never presented below, and has not presented here, a precise explanation as to when the Speedy Trial Act clock started, when it lapsed, and when a violation occurred. Even after we requested letter briefs on the point, Sylvester still has not explained the underlying premises of his Speedy Trial argument. By any conventional measure of forfeiture, Sylvester has forfeited this argument.

**IV.**

Sylvester's final argument is that the district court erred when it held that his Sixth Amendment right to a speedy trial was not violated.

We review de novo a district court's adjudication of a constitutional speedy trial claim. United States v. Gardner, 488 F.3d 700, 719 (6th Cir. 2007).

The Supreme Court has established a balancing test to determine whether a Sixth Amendment speedy trial violation has occurred, taking into consideration: "(1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted." Id. (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)). No one factor alone is enough to establish a violation; rather, we must conduct a balancing analysis, taking into account other relevant factors. United States v. Schreane, 331 F.3d 548, 553 (6th Cir. 2003). We have held that

a one-year delay between indictment and trial is presumptively prejudicial, triggering the Barker analysis. Id.

While the detention-to-trial-date delay in Sylvester's case could be described as "uncommonly long," the government issued eight superseding indictments and added three codefendants. Sylvester filed numerous motions to delay trial, including four challenges to the performance of his counsel that required several "ends of justice" delays and continuances.

Sylvester argues only the final Barker factor, but he fails to show how the delay prejudiced his case. Sylvester claims that his grandfather, who allegedly died in July 2004, loaned him $30,000 in cash prior to his arrest, a fact he claims would have supported his defense, because the government sought to prove that the large sums of money found at his house originated as drug proceeds. Sylvester fails to show how the absence of his grandfather's testimony prejudiced his case, or would have changed the outcome of the trial.

The government introduced a great deal of damaging evidence against Sylvester in support of its charges, including drugs seized on his person, more drugs and numerous firearms and ammunition seized at his home, and collaborating witness testimony. Of the large sums of money found in Sylvester's possession and shown to have been transferred in and out of his possession, no single sum reflected the claimed $30,000 loan. We conclude that the balance of the Barker factors tips in the government's favor and we hold that the district court properly held that Sylvester's constitutional right to a speedy trial was not violated.

**V.**

The district court's judgment is **AFFIRMED**.