**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0732n.06

Case Nos. 12-4056; 12-4060

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Sep 19, 2014 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| MICHAEL LOMBARDO and STEVEN | ) | OHIO |
| BARKUS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: SILER, McKEAGUE, and WHITE, Circuit Judges.

**SILER**, Circuit Judge. Defendants Michael Lombardo and Steven Barkus appeal their convictions arising from a fraud scheme. Both defendants were convicted of conspiracy to commit mail fraud and wire fraud; securities fraud; conspiracy to defraud the United States; and income tax evasion. Barkus was also convicted of wire fraud and mail fraud, but Lombardo was acquitted of these charges. Both defendants challenge the sufficiency of the evidence to support their convictions. Lombardo also argues that the indictment was multiplicitous as to the conspiracy counts. Barkus further argues that the indictment was rendered duplicitous by the use of incorporation clauses; that the government improperly bolstered witness testimony; that the district court impaired his ability to present a complete defense because of certain evidentiary rulings and jury instructions; that his counsel's failure to secure attendance of defense witnesses

constituted ineffective assistance of counsel; and that his sentence was not procedurally reasonable. For the following reasons, we **DECLINE TO REVIEW** Barkus's claim for ineffective assistance of counsel and **AFFIRM** as to all other claims.

## BACKGROUND

### I.      Discovery of Defendants' Fraud Scheme

Daniel Dever, an employee of the Criminal Investigation Division of the Internal Revenue Service ("IRS"), discovered defendants' activities that eventually led to their indictment. Dever was investigating an unrelated deposit into the Interest on Lawyers' Trust Account ("IOLTA") of Steven Helfgott, a disbarred Ohio attorney, when he noticed deposits related to the defendants. As a result of the investigation into his IOLTA account, Helfgott pleaded guilty to conspiracy to defraud the United States and cooperated in the subsequent investigation of the defendants. Based on an analysis of the IOLTA, Dever testified that the defendants received over $550,000 each from 2000 to 2006.

### II.      Defendants' Indictment

In 2009, the defendants were indicted for conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371 (count 1); wire fraud in violation of 18 U.S.C. § 1343 (count 2); mail fraud in violation of 18 U.S.C. § 1341 (counts 3-4); securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff (count 5); and conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (count 6). The indictment also charged Barkus (counts 7, 9, 11, 13) and Lombardo (counts 8, 10, 12, 14, 15) with income tax evasion in violation of 26 U.S.C. § 7201.

### III.  Defendants' Trial

The defendants were tried simultaneously, with many of their investors testifying against them at trial.  We rely on their testimony, as well as the testimony of others, to explain the trial proceedings and to describe the underlying fraud scheme.

### A.  Typical Description of Defendants' Activities by Investors

Roland Linder met Barkus in 1999 at an investment presentation by Barkus, prompting Linder to invest $50,000 and to sign a contract that day.  Linder received three promissory notes reflecting his investment and stating that he would be repaid the $50,000 plus $6,250 interest on or before September 22, 1999.  Barkus signed the notes as an officer of PCF Partners Funds, Inc. ("PCF"), an entity controlled by Lombardo and Barkus.

When Linder was not repaid, he placed many calls to Barkus from 1999 to 2008 to inquire about his investment and to receive repayment.  Barkus would repeatedly tell him that there was a delay but that the money would be coming from other deals.  However, Linder never received any repayment on what he characterizes as an investment.

### B.  Defendants' Telecommunications Companies

In 1989, Barkus joined Lombardo in California to establish various telecommunications-related companies.  They started American Telecom Interconnect ("ATI"), an equipment leasing company that would sublease autodialers, or computers that differentiate local calls from long distance calls, to their service companies.  The purpose of ATI was to help with cashflow problems by having private individuals purchase the autodialers and lease them back to ATI.

The defendants also formed a telecommunications capital growth fund that functioned by having investors purchase securities.  However, the companies experienced difficulties.  First, in 1994, the Northridge earthquake destroyed most of their equipment, forcing them to stop

business in 1995. Then, as they were trying to sell the companies, the defendants encountered problems with the Securities Exchange Commission ("SEC") and the IRS. The SEC notified Lombardo and Barkus that they were investigating one of the individuals who had introduced potential purchasers of autodialers. The SEC maintained that the autodialers they were selling were unregistered securities. The defendants then entered into a consent decree, in which they neither admitted nor denied any wrongdoing, and were ordered to repay the investment. However, because of their financial status, they were not ultimately required to do so. Therefore, the potential sale of the business fell through. The complaint then triggered an IRS investigation.

### C. IRS Investigations

Kristy Morgan testified regarding Lombardo and Barkus's tax history with the IRS. Both men first encountered problems as to the 1993 tax year. Barkus did not file his 1993 tax return until 1997. Barkus and the IRS agreed that he owed $381,364 and a tax assessment was filed in 2000. He filed two offers in compromise, but the IRS rejected both.[1] In 2001, the IRS assessed a tax lien. As of January 20, 2011, he owed the IRS $1,132,677.11.

On Lombardo's 1993 tax return, he claimed he did not owe any taxes despite taxable income of $1,181,401. In 2000, the IRS assessed his tax liability at $454,528. His tax liability was discharged in bankruptcy in 2006. Lombardo did not file tax returns from 2000 to 2007.

Thomas McKenna, an IRS appeals officer, testified that he was assigned to the tax appeals cases of Barkus, Lombardo, and the telecommunications companies. He stated that he believed "that income from [the autodialers] was taxable to the [defendants] because it

---

[1] Betty Huerta-Harris, an IRS revenue officer, worked on Barkus's offers in compromise. Because she did not have complete financial information to evaluate his offer and because Barkus failed to supply documentation she requested, she recommended his offer be returned without any action being taken.

appear[ed] that the [defendants] misrepresented . . . the sales/leaseback arrangement to the investors and were paying old investors with income from new investors."

Gregory Yurick, an IRS revenue officer, testified to Lombardo's bankruptcy discharge of his tax liability. Lombardo failed to list many of his assets, failed to accurately report his income, and failed to divulge other pertinent information when he filed his bankruptcy petition, thus preventing the bankruptcy court from accurately determining Lombardo's financial situation.

Throughout their history with the IRS, the defendants employed tax professionals in order to help resolve these matters, including Louis Garbutt, a California accountant, whom they hired in 2000 to prepare their individual tax returns and the tax return for PCF.

Lombardo hired Folly Posenauer, a California accountant, to prepare his 2003 and 2004 tax returns. She based his returns on information received solely from Lombardo, but Lombardo did not supply her any documentation. After she told him the amounts he owed for 2003 and 2004, Lombardo said he didn't want to pay that amount so he was going to get receipts because she said she would change the returns if he could provide more expenses. However, he never provided any additional receipts, so the tax returns were never filed.

Edward Esposito, a California attorney, represented Barkus, Lombardo, and PCF in 2006 while working on a purchase/sale agreement for AuraSoothe. In November 2006, he corresponded with many of the defendants' investors, promising repayment of their investments upon the sale of AuraSoothe. Each letter stated that Esposito was representing the defendants and PCF. To Esposito's knowledge, the sale of AuraSoothe did not occur.

### D. AuraSoothe

Harry Berg was the inventor of a psoriasis lotion that he used to relieve his symptoms. Lombardo asked Berg to meet to discuss getting the product on the market. Berg learned of Barkus when Lombardo brought him a draft of the agreement to start the business. Under the final agreement, Berg would supply the formula in exchange for a 31.67% ownership interest, while Lombardo was supposed to handle the marketing and Barkus was supposed to handle business operations. The company and product came to be known as AuraSoothe.

Victor Rothgarn, a friend of Lombardo, invested $50,000 in AuraSoothe in exchange for 1% equity. Under the purchase agreement, Rothgarn was to be repaid $60,000 between a year and 14 months. He first wrote a check payable to PCF in 2004. In the memo line, Rothgarn was going to write "investment," but Lombardo told him to write "loan." However, in Rothgarn's mind, it was an investment, not a loan.

Rothgarn later invested $50,000 more in AuraSoothe in exchange for 1% equity. He delivered the money via wire transfer. The parties also agreed that at any future time Rothgarn could get back $20,000, or the amount he borrowed on his 401(k) to finance the purchase. Rothgarn was hesitant to invest the second $50,000 because he did not have the money, but Barkus was adamant that Rothgarn needed to invest, so Rothgarn felt pressured to do so.

When Rothgarn requested $20,000 be repaid in 2009, he only received $5,000. Then, after his insistence, he received another $5,000 about a month later. He then requested the defendants cash him out of his interest for $90,000 plus $10,000 interest, representing the five years his money was in AuraSoothe. The defendants repeatedly assured him they were selling the company and that the sale was "just around the corner," but Rothgarn did not receive any further repayment from the defendants.

### E. Steven Helfgott and Helfgott's IOLTA

Helfgott was an attorney in Cleveland, Ohio from 1978 until 2006, when he lost his law license for unrelated matters. He and Barkus were college roommates and good friends.

In 2000, Helfgott approached Barkus about his financial situation, thinking Barkus might be able to help him since Helfgott believed Barkus had done well in the financial markets. Barkus mentioned a project on which he was working and that Helfgott might be able to provide some legal assistance. Barkus said he needed help forming Timbertop, LLC, and that he wanted to protect his assets from creditors. Barkus later asked Helfgott to manage his finances while Barkus traveled, and Helfgott agreed, deciding originally to use his IOLTA for this purpose.

Aside from some legitimate client transactions, Helfgott received specific instructions primarily from Barkus to make distributions from the IOLTA, but he believed Lombardo would occasionally call with instructions. Helfgott identified wiring instructions he received in Cleveland, Ohio from Barkus to distribute funds to various people and entities, including Barkus, Lombardo, PCF, AuraSoothe, Barkus's creditors, and others, including instructions to pay credit card bills. Helfgott also identified wiring instructions sending funds to Lombardo's bank account. Helfgott testified that the "money was coming into the IOLTA account and being used primarily to pay either expenses, personal expenses of Mr. Barkus and Mr. Lombardo, or [to] pay directly to them" and that "the funds for the most part were going to their benefit."

Helfgott also testified as to the origin of some of the money that went into the IOLTA account. For example, he described seeking out Sam Robinson in an effort to receive funding, purportedly to pay scientists involved in an entity that planned to capture solar energy to provide electrical power. Robinson eventually agreed to loan $60,000 directly to Barkus. Helfgott provided Robinson instructions to wire the money to the IOLTA and, in return, Robinson

received a promissory note that did not mention the IOLTA. Helfgott then disbursed that money pursuant to Barkus's instructions and, according to Helfgott, none of that money went to the solar energy entity or to pay the scientists.

Helfgott further testified to his knowledge of the defendants' issues with the IRS, stating that he did not originally know of the IRS lien, but that he learned of these issues between 2000 and 2006 and that Barkus told him about the IRS lien. Helfgott knew that:

> . . . the use of [his] IOLTA account would have prevented . . . collection largely because the IRS wouldn't know that funds were coming in for [their] benefit . . . because the trust account is an account that can't be attached by parties or by third parties generally, including the government. And, more importantly, the account would be in [his] name and not in someone else's name.

Therefore, he realized that the IRS would not know he was handling the money and would not be able to perform any collection activity.

## IV. Defendants' Convictions

The jury found Barkus guilty on all counts. The district court sentenced him to 97 months' imprisonment on counts 2 through 5 and 60 months' imprisonment on the remaining counts, to run concurrently, followed by three years' supervised release. The jury found Lombardo guilty of count 1, count 5, count 6, and counts 8, 10, 12, 14, and 15. The district court sentenced him to 57 months' imprisonment on all counts, to run concurrently, followed by three years' supervised release. The jury acquitted him of counts 2 through 4.

## V. Defendants' Appeals

At the close of the government's argument, the defendants moved the court for a judgment of acquittal. Then, in a post-trial motion, the defendants renewed their motions for judgment of acquittal and a new trial. The court denied all of their motions. Barkus now asks this court to find that his convictions are not supported by sufficient evidence. If the evidence

was sufficient, he asks that we reverse and grant a new trial in a proper venue because of the trial errors raised in this appeal, including his counsel's failure to secure the attendance of witnesses; or, if this court affirms his convictions, to vacate his sentences due to procedural error in the calculation of his Guideline range. Lombardo asks this court to reverse his convictions because they are not supported by sufficient evidence and because the conspiracy counts are multiplicitous.

## DISCUSSION

### I.    Sufficiency of the Evidence

We review de novo a district court's denial of a motion for judgment of acquittal based on the insufficiency of evidence, construing "the evidence in the light most favorable to the government, and then determine[s] whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). We review de novo a district court's denial of a motion for judgment of acquittal based on improper venue. *United States v. Zidell*, 323 F.3d 412, 420 (6th Cir. 2003). Viewing the evidence in the light most favorable to the government, we ask whether a rational trier of fact could find that venue is proper by a preponderance of the evidence. *Id.* at 420-21. We review a district court's denial of a new trial for abuse of discretion. *United States v. Lawrence*, 555 F.3d 254, 261 (6th Cir. 2009).

### A. Defendants' Appeals as to Counts 1 and 6

#### i. Barkus's Appeal as to Sufficiency of Evidence for Venue

Barkus argues that the government failed to prove proper venue because there was no evidence of an agreement between Helfgott and Barkus to pursue a common objective of evading federal income taxes (count 6) or of defrauding private individuals (count 1).

"[T]he government must prosecute an offense in a district where the offense was committed." FED. R. CRIM. P. 18. In criminal conspiracies, venue is proper "in any district where the conspiracy was formed or in any district where an overt act in furtherance of the conspiracy was performed." *United States v. Scaife*, 749 F.2d 338, 346 (6th Cir. 1984).

Helfgott used his IOLTA account in Cleveland at the direction of Barkus and knew that the funds were used for the defendants' benefit and that use of the account would prevent the IRS from collecting from the defendants. Therefore, overt acts as to both counts 1 and 6 were performed in the Northern District of Ohio and venue was thus proper.

#### ii. Defendants' Appeals as to Sufficiency of Evidence for Elements of Crimes

Counts 1 and 6 both charged conspiracy in violation of 18 U.S.C. § 371. According to the jury instructions, for a guilty verdict on count 1, the government had to prove beyond a reasonable doubt:

> First, that two or more persons conspired, or agreed, to commit the crime of mail fraud or wire fraud. Second, that the defendant knowingly and voluntarily joined the conspiracy. And, third, that a member of the conspiracy did one of the overt acts described in the superseding indictment for the purpose of advancing or helping the conspiracy.

In order to prove wire fraud, the government must show beyond a reasonable doubt a scheme to defraud and the use of an interstate electronic communication in furtherance of the

scheme. *United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998). In order to prove mail fraud, the government must show beyond a reasonable doubt a scheme to defraud and use of the mails in furtherance of the scheme. *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Id.* The government need only show that "the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails." *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001).

According to the jury instructions, for a guilty verdict on count 6, the government had to prove beyond a reasonable doubt:

> First, that two or more persons conspired, or agreed, to defraud the United States or one of its agencies or departments by dishonest means. . . . Second, . . . that the defendant knowingly and voluntarily joined the conspiracy. And, third, . . . that a member of the conspiracy did one of the overt acts described in the superseding indictment for the purpose of advancing or helping the conspiracy.

In order to prove a conspiracy existed, a showing of a mutual understanding among the parties is sufficient. *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011). A conspiracy may be inferred from acts done with a common purpose so long as the "defendant [knew] of the conspiracy, associate[d] himself with it, and knowingly contribute[d] his efforts in its furtherance." *United States v. Barger*, 931 F.2d 359, 369 (6th Cir. 1991).

### 1. Barkus's Appeal

Barkus argues that the government failed to offer sufficient proof as to counts 1 and 6. However, the government was able to prove that Helfgott, Barkus, and Lombardo knowingly and voluntarily conspired to commit mail and wire fraud and to defraud the United States.

Helfgott specifically explained his efforts with Barkus to obtain money from private individuals and then to transmit that money to the IOLTA via wire. He also testified that he knew the IRS would not be able to collect money that was in the IOLTA, much less be aware of the money. Finally, Helfgott admitted to committing at least one of the overt acts charged in the conspiracies for counts 1 and 6 when they transferred money by wire primarily for the benefit of the defendants through the IOLTA. Therefore, Helfgott's testimony indicates a mutual understanding among the parties to participate in the conspiracies.

### 2. Lombardo's Appeal

Lombardo argues that the evidence is not sufficient to support his conviction on count 1 because it did not show that he had an agreement with Barkus and Helfgott to commit wire and mail fraud, that he had knowledge and intent to join the conspiracy, or that he committed an overt act toward that end. He further argues that there was not sufficient proof to support a conviction on count 6 because nothing in the evidence suggested a purpose by any of them to evade taxes and because the government did not offer independent proof that Helfgott intended to assist Lombardo in evading taxes.

The government proved that Lombardo conspired with Barkus and Helfgott to defraud the United States. Helfgott testified that most of the distributions from his IOLTA went to benefit Lombardo and Barkus. Helfgott specifically identified wiring instructions leading to Lombardo's bank account. He also testified that he knew that the use of the IOLTA would have

prevented the IRS from collecting from Lombardo because it would not have known about the account.

Esposito sent letters to the defendants' investors in November 2006 promising repayment and specifically naming Lombardo as his client. These letters were sent within weeks of when IRS Special Agent Dever interviewed the defendants, which serves as circumstantial evidence that Lombardo and Barkus were participating in a common plan to defraud the United States.

The government proved that Lombardo committed an overt act. He was directly involved in soliciting Rothgarn's investment and instructed him to characterize his investment as a loan. Rothgarn's last investment was made via wire, fulfilling the underlying crime of wire fraud.

## B. Defendants' Appeals as to Count 5

Lombardo and Barkus argue that there was insufficient evidence to support their conviction on count 5 because Rothgarn was not defrauded.

According to the jury instructions, for a guilty verdict on count 5, the government had to prove beyond a reasonable doubt:

> First, the defendant knowingly did any one of the following: Employed any device, scheme or artifice to defraud, as detailed in Count 5; or made any untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or engaged in a transaction, practice, or course of business that operated, or would operate, as a fraud or deceit upon any person. Second, that the defendant did so in connection with the purchase or sale of securities. Third, in connection with this purchase or sale, the defendant made use of or caused the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national security exchange. And, fourth, that the defendant acted with the intent to defraud.

The government was able to prove through Rothgarn that the defendants engaged in securities fraud. Rothgarn made two investments in AuraSoothe in exchange for an equity interest in the company. Even though Lombardo instructed him to characterize his investment as

a loan on his checks, Rothgarn thought of it as an investment in the company. Rothgarn also used wire transfers for his second investment. He testified that he felt pressured by Barkus to invest the second time and was uncomfortable with the arrangement since he was borrowing from his 401(k) retirement plan. Rothgarn did not receive repayment by the terms of his purchase agreements despite multiple reassurances from the defendants that he would receive repayment, and only received $10,000 after repeatedly pressuring the defendants.

Further, Lombardo contends that he did not make fraudulent statements about the company or the product, but the fact that he may not have made any misrepresentations regarding the product itself does not preclude a securities fraud conviction. The government produced sufficient evidence that the defendants misrepresented the nature of the investment.

### C. Lombardo's Appeal as to the Tax Evasion Counts

Lombardo argues that the evidence was not sufficient to support his conviction on counts 8, 10, 12, 14, and 15 for tax evasion.[2] He claims that the evidence shows mere delay in the payment of taxes and his use of lawful avenues throughout.

According to the jury instructions, for a guilty verdict on the tax evasion counts, the government had to prove beyond a reasonable doubt:

> A federal income tax was due and owing from the defendant for the calendar year charged. The defendant attempted to evade or defeat this tax or payment thereof as detailed in the superseding indictment. And in attempting to evade or defeat such tax or the payment thereof, the defendant acted willfully.

The government proved through Morgan's testimony that Lombardo owed taxes for all calendar years charged and that he attempted to evade taxes by either incorrectly reporting his taxes (1993) or not filing tax returns (2003-2006). It also proved through Yurick's testimony

---

[2] Count 8 was based on Lombardo's 1993 tax deficiency; while counts 10, 12, 14, 15 were based on 2003, 2004, 2005, and 2006, respectively.

that Lombardo acted willfully when he had his tax liability discharged by the bankruptcy court without properly reporting his assets and income, preventing the bankruptcy court from accurately determining his financial situation.

### D. Conclusion

Viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that venue is proper by a preponderance of the evidence, *Zidell*, 323 F.3d at 420-21, and a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *Clay*, 667 F.3d at 693.

## II. Multiplicity

At the close of the government's case and in a post-trial motion, Lombardo asserted that the indictment contained an impermissible and prejudicial variance as to counts 1 and 6 based on Helfgott's testimony. However, he now contends that this argument is better characterized as an attack on multiplicity grounds and does not renew his variance argument. Lombardo argues that the indictment was multiplicitous as to counts 1 and 6 because it permitted the same conduct to support two separate conspiracy convictions under 18 U.S.C. § 371, prejudicing Lombardo by allowing the jury to convict him on count 6 based on the same conduct asserted in count 1.

Federal Rule of Criminal Procedure 12(b)(3) requires a party to raise a motion alleging a defect in the indictment or information prior to trial, unless the objection is jurisdictional. FED. R. CRIM. P. 12(b)(3)(B). A party waives a Rule 12(b)(3) defense, objection, or request that it does not raise prior to trial, but the court may grant relief for good cause. FED. R. CRIM. P. 12(e). However, "waiver of a claim of error of multiplicity in the indictment [is] not a waiver of a claim of error affecting substantive rights." *United States v. Abboud*, 438 F.3d 554, 566 (6th Cir. 2006).

Therefore, the question is whether the defendant "made any substantive objections to the multiplicity in the indictment." *Id.* at 567.

In both of Lombardo's motions for judgment of acquittal, he argued that the indictment infringed upon his right to know the charges levied against him. Therefore, he made a substantive objection to his indictment and thus has not waived his multiplicity argument. *See id.* ("Defendants only object to the form of the indictment. . . . Defendants never claim violation of a substantive right, such as sentences in violation of double jeopardy. As a result, Defendants waived their claim of multiplicity with respect to the indictment.").

We review a claim of multiplicity de novo when the defendant is claiming that he was convicted and sentenced for multiplicitous counts in violation of the Double Jeopardy Clause. *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008). Multiplicity is charging what should be a single offense in more than one count in an indictment. *Id.* Generally, we must determine whether each provision requires proof of a fact that the other does not, thus complying with the Double Jeopardy Clause. *Id.* However, in the case of conspiracy charges, we apply a totality of the circumstances test to determine whether the government can prosecute more than one conspiracy. *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983). We examine whether there exists more than one agreement and consider the following factors:

> 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place.

*Id.*

Count 1 charges the defendants with conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371; describes the general allegations, manner and means, and overt acts

supporting the charge; and describes allegations and objects specific to the count 1 conspiracy. Count 6 charges the defendants with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Count 6 incorporates the general allegations, manner and means, and overt acts of count 1, but adds allegations, objects, manner and means, and overt acts specific to count 6.

Under the time factor, both conspiracy counts charge from at least 2000 through 2006. As to persons acting as co-conspirators factor, Barkus, Lombardo, and Helfgott were named in both counts. The places alleged were also the same between each count. Although these three factors weigh in favor of finding one conspiracy, the remaining factors weigh heavily in favor of finding multiple conspiracies and thus indicate that the alleged conspiracies were separate offenses.

As to the third factor, when the same statutory offenses are charged, this tends to weigh in favor of a single conspiracy. *In re Grand Jury Proceedings*, 797 F.2d 1377, 1382 (6th Cir. 1986). However, we must also look to the underlying offenses. *Sinito*, 723 F.2d at 1258. Count 1 charged Lombardo with conspiracy to commit mail and wire fraud, while count 6 charged him with conspiracy to defraud the United States in connection with tax evasion. Because the underlying offenses are unrelated, this factor weighs in favor of multiple conspiracies.

As to the fourth factor, the overt acts and other descriptions of the offenses charged also weigh in favor of multiple conspiracies. Although count 6 incorporates by reference the 28 overt acts alleged in count 1, count 6 adds 12 more overt acts. Lombardo argues that, since the government is only required to prove one overt act committed in furtherance of the conspiracy in order to convict, the jury could have determined that the same overt act supported Lombardo's conviction on both counts 1 and 6. Although Lombardo is correct, it is irrelevant to the fourth factor because the factor only asks the court to consider "the overt acts charged by the

- 17 -

government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case." *Sinito*, 723 F.2d at 1256. Therefore, the overt acts show multiple conspiracies were charged in counts 1 and 6.

Considering the totality of the circumstances, counts 1 and 6 charged different conspiracies. *Id*. Therefore, the indictment was not multiplicitous because it did not charge a single offense in more than one count. *Swafford*, 512 F.3d at 844.

## III. Duplicity

Barkus argues that the use of incorporation clauses resulted in a duplicitous indictment, depriving him of his right to unanimous jury determinations as to his guilt and the existence of proper venue.

Generally, whether an indictment is duplicitous is a question of law this court reviews de novo. *United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007). Nevertheless, the standard is different where the defendant fails to challenge the indictment before trial or object to the jury instructions. *Id*. at 444-45.

A motion alleging a defect in the indictment must be made before trial. FED. R. CRIM. P. 12(b)(3)(B). However, "the alleged harm to the defendant's substantive rights resulting from a duplicitous indictment can be raised at trial or on appeal, notwithstanding the defendant's failure to make a pretrial motion." *Kakos*, 483 F.3d at 444. The standard of review then depends on whether the defendant objected to the district court's jury instructions:

> Where a defendant fails to object to an indictment before trial, the case proceeds under the presumption that the court's instructions to the jury will clear up any ambiguity created by the duplicitous indictment. . . . Where the defendant does not object to the district court's instructions to the jury, review is limited to plain error.

*Id.* at 444-45. Because Barkus did not object to the jury instructions, we review for plain error.

In the indictment, count 1 fully describes the general allegations, allegations specific to the conspiracy, objects of the conspiracy, manner and means, and overt acts supporting the charge. The 15 remaining counts incorporate by reference the general allegations, manner and means, and overt acts from count 1. They do not incorporate the allegations specific to the conspiracy and the objects of the conspiracy, but instead supplement their charges with allegations specific to each count.

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense[s] charged" and "[a] count may incorporate by reference an allegation made in another count." FED. R. CRIM. P. 7(c)(1). "An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *Kakos*, 483 F.3d at 443 (quoting *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002)). "The overall vice of duplicity is that the jury cannot in a general verdict render its findings on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." *Id*. (quoting *United States v. Duncan*, 850 F.2d 1104, 1108 n.4 (6th Cir. 1988), *overruled on other grounds by Schad v. Arizona*, 501 U.S. 624 (1991)).

In the defendant's indictment in *United States v. Robinson*, allegations regarding his charge for conspiracy to commit wire and mail fraud were incorporated by reference into his substantive counts of aiding and abetting wire and mail fraud. 651 F.2d 1188, 1194 (6th Cir. 1981). The defendant argued that the incorporation by reference violated the rule against duplicity because the conspiracy was thus charged in each count. *Id.* We disagreed, noting that the incorporation by reference was explicitly limited to a particularization of the means used. *Id*.

Barkus is not able to demonstrate plain error affecting his substantial rights because his indictment was not rendered duplicitous by the use of incorporation clauses. *Cotton*, 535 U.S. at

- 19 -

631. The incorporation clauses were explicitly limited to the general allegations, manner and means, and overt acts. This particularization thus avoided the problem of duplicity. Further, the problem of duplicity is not implicated here because the jury was able to render its findings on each offense by utilizing the incorporated allegations, manner and means, and overt acts, as well as each count's specific allegations.

## IV. Witness Bolstering by the Government

Barkus argues that the government improperly bolstered Helfgott's testimony by introducing Helfgott's plea agreement, supplemental information, and criminal judgment and using them as substantive evidence of Barkus's guilt, ultimately prejudicing the outcome. Barkus argues that the prejudicial effect was exacerbated by the failure of the district court to give the jury a contemporaneous cautionary instruction during the direct examination of Helfgott.

Where counsel fails to object to the government's questioning, we review the government's statements for plain error. *Zidell*, 323 F.3d at 425. Our "authority to correct a plain error is discretionary, and should be employed only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). Where counsel fails to request a limiting or curative instruction, we can only reverse for plain error affecting substantial rights. *United States v. Benson*, 591 F.3d 491, 498 (6th Cir. 2010).

Helfgott testified that he pleaded guilty to conspiracy to defraud the United States and that the other charges against him were dismissed. He acknowledged that, as part of his plea agreement, the government agreed to a downward departure in his sentence if he cooperated and provided assistance in the defendants' investigation. Helfgott testified that he was sentenced to

18 months' imprisonment, a sentence below the Guideline range that was contemplated in the plea agreement, over the government's objection. In eliciting this information, the government published the plea agreement, the supplemental information, and the criminal judgment to the jury. The government questioned Helfgott about the objects of the conspiracy as set forth in his plea agreement. Helfgott testified that he did not dispute the facts to which he pleaded guilty, but also testified as to what he actually did. Then, the district court admonished the jury that "[t]he fact that Steven Helfgott has pleaded guilty to a crime is not evidence that the defendant is guilty, and you cannot consider this against the defendant in any way."

"[C]o-conspirator guilty pleas are not admissible as substantive evidence of the defendant's guilt." *Benson*, 591 F.3d at 498. However, they may be introduced if the co-conspirator testifies at trial for the limited purpose of assessing his credibility. *Id.* "[A] plea agreement could be interpreted as either bolstering or hurting a witness' credibility, so [] introduction of the entire agreement is appropriate to permit the jury 'to consider fully the possible conflicting motivations underlying the witness' testimony.'" *United States v. Thornton*, 609 F.3d 373, 377 (6th Cir. 2010) (quoting *United States v. Tocco*, 200 F.3d 401, 416 (6th Cir. 2000)). Further, the government may want to introduce the plea "so as to blunt defense efforts at impeachment and dispel the suggestion that the government or its witness has something to hide." *Id.* (quoting *United States v. Christian*, 786 F.2d 203, 214 (6th Cir. 1986)).

Even though a co-conspirator's guilty plea can be especially prejudicial if it is introduced in connection with the conspiracy for which the defendant is charged, much of the potential for prejudice is negated when the co-conspirator testifies about the underlying facts. *Id.* at 378. For example, in *Thornton*, the court held that the potential prejudice of the plea was negated because the co-conspirator testified directly to the acts and his relationship with the defendant. *Id.*

When a guilty plea is offered to assess a co-conspirator's credibility as a witness, "the district court must give a cautionary instruction to the jury informing them of the limited scope in which they may consider the evidence of a guilty plea." *Benson*, 591 F.3d at 498.

Evidence of Helfgott's guilty plea was admissible for the purpose of assessing his credibility as a witness. It was within the government's rights to ask Helfgott about his plea so as to blunt any defense efforts to impeach Helfgott's credibility. It was also appropriate for the government to introduce the entire agreement so the jury could fully consider Helfgott's motivations. Although Helfgott's guilty plea could have been especially prejudicial since his plea involved the same conspiracy, the prejudice was negated because Helfgott testified as to the underlying facts relevant to his relationship with Barkus.

Therefore, allowance of the government's use of the plea agreement did not constitute plain error that seriously affected the fairness, integrity, or public reputation of Barkus's trial. *Zidell*, 323 F.3d at 425. The limiting instruction given by the district court at the end of trial protected Barkus's substantial rights because it adequately limited the scope in which the jury could consider Helfgott's guilty plea. *Benson*, 591 F.3d at 499. Further, Barkus "has pointed to no authority requiring the limiting instruction to be given at the time [Helfgott] testified." *Id.*

## V. Evidentiary Rulings

This court reviews all evidentiary rulings by the district court for abuse of discretion. *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003).[3] A district court abuses its

---

[3] Barkus argues that this court reviews de novo the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions and cites *United States v. Salgado*, 250 F.3d 438 (6th Cir. 2001), for this proposition. However, the Supreme Court has held repeatedly that abuse of discretion is the proper standard of review for evidentiary rulings. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997) (holding that abuse of

discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard. *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004).

### A. Evidence of Pre-Indictment Negotiations with the Government

Barkus first argues that the district court unfairly excluded evidence of his attempt to demonstrate his innocence to the government when he first learned of the tax evasion allegations.

During Barkus's direct examination, his counsel tried to have Barkus identify an agreement that would show that, when Barkus learned he was under investigation, he hired legal counsel to meet with the government to present his case. The government objected, and the district court ruled that the evidence was "not relevant to this trial and to the charges and as to whether or not [Barkus] is guilty or not guilty of the charges."

The district court did not abuse its discretion when it ruled that testimony regarding Barkus's pre-indictment negotiations with the government was not relevant. *Schreane*, 331 F.3d at 564.[4] As the district court noted, the proffered evidence was not relevant to whether Barkus was guilty of the charges. The fact that he hired counsel and met with the government does not tend to make it less probable that Barkus was guilty of the crimes charged. Barkus argues that the effect of excluding the evidence was to make it look to the jurors as if "he simply buried his head in the sand and waited idly until he was served with the indictment." Even if this is true, it

---

discretion is the proper standard of review of a district court's evidentiary rulings and citing other Supreme Court cases that stand for this proposition).

[4] Barkus relies on *Crawford v. United States*, 212 U.S. 183 (1909), for the proposition that he was entitled to offer the evidence showing that he responded in a proactive manner expected of an innocent and responsible businessman. However, the defendant in *Crawford* admitted to taking evidence from a third party and explaining why he had done so, *id.* at 201-02, which is not similar to Barkus's trying to show that he reached out to the government to prove his innocence before they first indicted him.

does not demonstrate how the proffered evidence would have made it less likely that he was guilty.

### B. Third-Party Statements Made to Barkus

Barkus next argues that the district court unfairly excluded his testimony regarding written and oral statements made by others to Barkus that were offered as circumstantial evidence of his state of mind, thus depriving him of the ability to mount a defense of good faith.

During direct examination, Barkus tried to testify to the following statements made to him by third-party professionals: legal advice as to whether the autodialer leases were securities subject to registration and investor qualification requirements under federal law; advice from tax attorneys and an accountant regarding the tax consequences of the SEC consent decree characterizing the autodialer leases as securities; statements made by an IRS revenue officer during the audit of the 1993 tax returns of the telecom companies; and legal advice regarding the propriety of Barkus's and Lombardo's efforts to create trusts for their Timbertop interests.

Barkus argues that he was entitled to offer statements made by professionals that influenced the manner in which he conducted his financial affairs. In *Duncan*, we held that "[a] claimed defense of good faith reliance upon a tax preparer or tax counsel is a critical circumstance that may be dispositive of the central issue of willfulness." 850 F.2d at 1117. However, the four pieces of testimony offered by Barkus do not involve his good faith reliance upon professional tax advice. Barkus was accused of hiding income and failing to pay taxes, and none of those pieces of testimony indicates that the tax professionals advised him not to pay taxes or to hide his income and thus are not relevant to whether Barkus was guilty of the charges. Therefore, the statements were inadmissible.

### C. IRS Notice of Reclassification of Loans as Income

Finally, Barkus argues that the district court unfairly prevented him from testifying that he was not given notice that the IRS reclassified his loans as income and that he should have been allowed to explain how this lack of notice affected his understanding of their tax treatment.

During direct examination, Barkus's counsel asked him if the IRS ever notified him that it had reclassified loans to him as income. The government objected, and the district court sustained the objection. Barkus did in fact have the opportunity to testify that he "never received notification that [he] owed taxes from the years 2001 through 2006," stating that "[t]here was never a notification, either written or verbal, from any representative of the IRS." However, on cross, Barkus admitted that he "knew that [the IRS] had claimed that money was owed."

The district court did not abuse its discretion when it excluded testimony regarding Barkus's lack of notice from the IRS that it had reclassified loans as income. *Schreane*, 331 F.3d at 564. Barkus was in fact able to testify that he had not received notification from the IRS. However, his further testimony revealed that he did know the IRS was claiming that he owed money. Therefore, any lack of notice did not affect Barkus's understanding of his tax treatment.

### D. Conclusion

The district court did not abuse its discretion in its evidentiary rulings and thus did not deprive Barkus of his right to present a complete defense. *White*, 492 F.3d at 398.

### VI.   Jury Instructions

Barkus argues that the district court substantially impaired his defense, amounting to an abuse of discretion, when it denied his request to add a jury instruction that failure to pay back a debt does not automatically support the conclusion that a defendant has intent to defraud his

lender. Barkus requested the jury be instructed that "[t]he subsequent nonpayment of borrowed funds standing alone does not constitute an intent to defraud" as to the mail fraud count. In denying Barkus's request, the district court held:

> . . . I have given multiple opportunities to discuss jury instructions. This was never requested.
>
> I have looked at the Sixth Circuit jury instructions; specifically, mail fraud, 10.01(1)(b), I'm sorry (2)(b), where it's being requested. I insert this language. The instruction I am giving is verbatim from the Sixth Circuit jury instructions. Therefore, I am not going to add this sentence.

The district court then gave the Sixth Circuit pattern jury instruction 10.01(2)(b).

We review a district court's refusal to give a requested jury instruction for abuse of discretion. *United States v. Gunter*, 551 F.3d 472, 484 (6th Cir. 2009). When the court refuses to give an instruction, we will reverse "only if that instruction is (1) a correct statement of the law; (2) not substantially covered by the charge actually delivered to the jury; and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Id.* (quoting *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)).

In *United States v. Stull*, the defendants, who were convicted of mail fraud, argued that the district court erred in refusing to instruct the jury that good faith defense "includes a defendant's belief or faith that a venture will eventually succeed no matter how impractical or visionary the venture may be." 743 F.3d 439, 441, 445-46 (6th Cir. 1984). We held:

> We find no error in the jury instructions. . . . [C]ourts have consistently held that a defendant's honest belief in the ultimate success of a venture is not in itself a defense to a charge of mail fraud. . . . [N]o matter how firmly the defendant may believe in the plan, his belief will not justify baseless, false, or reckless representations or promises.

*Id.* at 446 (internal quotation marks and citations omitted).

As in *Stull*, Barkus's intent to repay the loans and the evidence he says supports that contention is not a defense to his charge for mail fraud. Therefore, his proffered jury instruction is not a correct statement of the law. *Gunter*, 551 F.3d at 484. The district court did not abuse its discretion by refusing to give Barkus's requested jury instruction and did not substantially impair Barkus's theory of defense. *Id.*

## VII. Ineffective Assistance of Counsel

Barkus argues that his trial counsel was ineffective because counsel relied on Lombardo's attorney to subpoena and call essential defense witnesses, which he did not, thus depriving Barkus of his Sixth Amendment rights.

Claims of ineffective assistance of counsel "are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue." *United States v. Daniel*, 956 F.2d 540, 543 (6th Cir. 1992). We will only consider such a claim on direct appeal if the record allows us to adequately assess the merits of the defendant's allegations. *Id.* The record here does not allow us to adequately assess the merits of his claim; therefore, we will not review his claim.

## VIII. Reasonableness of Sentence

This court reviews the reasonableness of a district court's sentence under a deferential abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007). We must first ensure that the district court did not commit a significant procedural error. *Id.* at 51. If we determine that the decision was procedurally sound, this court should consider the substantive reasonableness of the sentence under the totality of the circumstances. *Id.*

## A. Tax Loss Calculation

Barkus argues that the district court's tax loss calculation was inflated because it included non-criminal tax deficiencies for the 1993 tax year; interest and penalties in violation of the Ex Post Facto Clause; and Lombardo's tax deficiency, which was beyond the scope of Barkus's conspiracy agreement with Lombardo and not foreseeable.

The district court used the November 2001 version of the Guidelines, which requires that interest and penalties be included in the calculation of tax loss where the case involves willful evasion of payment under 26 U.S.C. § 7201. USSG § 2T1.1 cmt. n.1. In addressing Barkus's argument that predicating the evasion of payment upon his 1993 tax lien violated the Ex Post Facto Clause, the district court found that the evidence supported a willful evasion from 2000 to 2006 and thus found the 1993 tax lien predicate irrelevant. As to Barkus's argument that the tax loss should not include Lombardo's tax deficiency because it was not foreseeable, the district court vehemently disagreed, stating:

> Well, the fact of the matter is, the Defendant was found guilty to evade assessment and payment of taxes. The evidence supports the verdict in that Defendant Barkus solicited and deposited funds in the IOLTA account and in the PCF account and received money from those accounts, thereby benefitting from the fraud.

> Further, the scheme was used to hide assets of both Defendant Barkus and Defendant Lombardo from the IRS. The resulting tax loss of Defendant Lombardo is certainly foreseeable to Defendant Barkus. Therefore, the loss amount for Defendant Barkus is going to include the amount of Mr. Lombardo's. Therefore, your objection is not well taken.

In regard to Barkus's first argument, when determining the tax loss attributable to the offense, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." USSG § 2T1.1 cmt. n.2. We held that "'all conduct violating the tax laws' must refer

to *all relevant criminal conduct underlying the charged offense*," *Daniel*, 956 F.2d at 544, including tax loss resulting from uncharged conduct. *United States v. Pierce*, 17 F.3d 146, 150 (6th Cir. 1994) (citing USSG § 1B1.3).

The district court did not abuse its discretion when it included interest and penalties from Barkus's 1993 tax deficiency. *Gall*, 552 U.S. at 41, 51.  It properly considered the 1993 tax lien, which was relevant conduct that violated the tax laws.  Further, it is irrelevant that Barkus was not charged in regard to the 1993 tax deficiencies.  Barkus did not produce evidence clearly demonstrating that his conduct in 1993 was not part of a common scheme—he evaded paying taxes at least from 1993 and through the dates charged in the indictment.  Therefore, the interest and penalties were properly includable.

As to Barkus's second argument, the court should use the Guidelines Manual in effect on the date that the defendant is sentenced, unless it would result in a violation of the Ex Post Facto Clause. USSG § 1B1.11; *see also United States v. Daulton*, 266 F. App'x 381, 389 (6th Cir. 2008).  "The application of a particular version of the Guidelines is retrospective if the version went into effect after the last date of the offense of conviction." *Id.* (quoting *United States v. Kilkenny*, 493 F.3d 122, 127 (2d Cir. 2007)).  The judiciary cannot punish "the defendant if the defendant did not have fair notice that such punishment was possible." *Id.* at 390.

The district court did not abuse its discretion in using the 2001 Guidelines and including interest and penalties in the tax loss calculation. *Gall*, 552 U.S. at 41, 51.  The application was not retrospective because they went into effect before the last date of Barkus's offense.  Therefore, Barkus had fair notice that interest and penalties could possibly be included in his punishment.

- 29 -

Finally, as to Barkus's third argument, "a defendant's sentence [in a tax loss case] may be based on both the tax loss that he caused directly and the tax loss caused by his coconspirators, if that loss was reasonably foreseeable to the defendant." *United States v. Clark*, 139 F.3d 485, 490 (5th Cir. 1998); *see also United States v. Schroeder*, 500 F. App'x 426, 438 (6th Cir. 2012) (holding that a co-conspirator's tax loss was foreseeable and thus attributable to the defendant).

The district court did not abuse its discretion when it held Barkus accountable for Lombardo's tax loss. *Gall*, 552 U.S. at 41, 51. It found that both defendants hid their assets from the IRS and, thus, the resulting tax loss of Lombardo was "certainly foreseeable" to Barkus. Therefore, Barkus's sentence properly included Lombardo's tax loss since Lombardo's tax loss was reasonably foreseeable to Barkus.

### B. Sophisticated Means Enhancement

Barkus argues that the district court should not have applied the sophisticated means enhancement because the mere hiding of transactions in Helfgott's IOLTA does not warrant the enhancement in the absence of especially complex or intricate conduct.

The Guidelines authorize a two-level increase in the base offense level if the fraud or tax offense involved sophisticated means. USSG §§ 2B1.1(b)(10), 2T1.1(b)(2). When Barkus objected to the sophisticated means enhancement, the district court disagreed, noting:

> . . . [I]f this isn't sophisticated means, I don't know what is.
>
> The use of that IOLTA account absolutely involved the hiding of transactions. Defendant Barkus directed investors to send money into that IOLTA account, and he and co-conspirator Lombardo withdrew money from that account and used that money for their own personal use.
>
> "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated

means." USSG §§ 2B1.1 cmt. n.9(B); 2T1.1 cmt. n.5. "Sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2T1.1 cmt. n.5.

The district court did not abuse its discretion as to the sophisticated means enhancement because the calculation was procedurally sound. *Gall*, 552 U.S. at 41, 51. The court found that the use of the IOLTA involved hiding of transactions, which is an example of sophisticated means given by the Guidelines. Further, the evidence shows that investors, such as Sam Robinson, would send funds to the IOLTA while giving the impression that the money would be used for business purposes once it reached its destination.

### C. Aggravating Role Enhancement

Barkus argues that the aggravating role enhancement should be rejected because his alleged role was equal to Lombardo's and Helfgott's.

Under the Guidelines, if a "defendant was an organizer, leader, manager, or supervisor in" criminal activity that involved five or fewer participants, the offense level increases by two levels. USSG § 3B1.1(c). Over Barkus's objection, the district court explained why the aggravating role enhancement was appropriate:

> . . . I am convinced of role in the offense simply in the manner in which he organized, led, and managed Mr. Lombardo, co-conspirator. So right there we have role in the offense, but I will go on to say that according to the testimony, he most directly directed co-conspirator Helfgott as to when to disperse the monies . . . coming into the IOLTA account.
>
> Many times during the testimony, Defendant Barkus characterized Helfgott as a mere bookkeeper, so the two levels for role in the offense will stand.

To qualify for the aggravating role enhancement, the defendant must have organized, led, managed, or supervised one or more other participants. USSG § 3B1.1 cmt. n.2. Further, our

review of the legal conclusion that a person is an organizer or leader is deferential because "[t]he

trial judge is most familiar with the facts and is best situated to determine whether someone is or

is not a 'leader' of a conspiracy that the jury found existed." *Washington*, 715 F.3d at 983.

The district court did not abuse its discretion as to the aggravating role enhancement

because the calculation was procedurally sound. *Gall*, 552 U.S. at 41, 51. Helfgott testified that

Barkus primarily instructed him on how to make disbursements from the IOLTA account. Both

Helfgott and Lombardo are participants because they were both held criminally responsible for

the conspiracy. Therefore, we will defer to the district court's conclusion that Barkus was a

leader of the conspiracy.

### D. Not Grouping the Fraud and Tax Counts

Barkus argues that the district court erred in refusing to group the fraud and tax counts.

The Guidelines provide for grouping counts "[w]hen one of the counts embodies conduct

that is treated as a specific offense characteristic in, or other adjustment to, the guideline

applicable to another of the counts." USSG § 3D1.2(c). In deciding not to group the tax and

fraud counts, the district court held that:

> . . . The two charged conspiracies are distinct offenses. Although some of the facts
> may be intertwined, they are distinct offenses. The two conspiracies also result in
> two different harms. Tax conspiracy, clearly, we have a harm to society. Fraud
> conspiracy, we have harm to individuals. The objection is not well taken.

In *Weinberger v. United States*, the defendant argued that his fraud and tax evasion

counts should have been grouped because they involved substantially the same harm. 268 F.3d

346, 353-54 (6th Cir. 2001). We disagreed, holding that:

> [The defendant's] fraud counts and the tax count consisted of different elements,
> affected different victims, and involved different criminal conduct. These factors
> indicate that [the defendant's] offenses must not be grouped together as they
> involve different types of crimes resulting in different harms. . . . By grouping

- 32 -

these charges, we would allow [the defendant] to evade punishment for his tax evasion conviction. This we cannot do.

*Id.* at 355.

The district court did not abuse its discretion when it did not group the fraud and tax counts because the calculation was procedurally sound. *Gall*, 552 U.S. at 41, 51. The district court noted that, despite some overlapping facts, the offenses were distinct and harmed different victims, which indicated that Barkus's offenses should not have been grouped together.

### E. Conclusion

The district court's decisions in reaching Barkus's Guidelines range were procedurally sound. *Gall*, 552 U.S. at 51. Further, the 97-month sentence was substantively reasonable. *Id.* Because the sentence was within the Guidelines range, it is entitled to a presumption of reasonableness which has not been rebutted. *Gall*, 552 U.S. at 51.

### CONCLUSION

For the reasons stated above, we **DECLINE TO REVIEW** Barkus's claim for ineffective assistance of counsel and **AFFIRM** as to all other claims.

**HELENE N. WHITE, Circuit Judge**, concurring. I concur but write separately to explain

my reasoning regarding Defendants' challenges to the sufficiency of the evidence.

**I.** **Count 1: Conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, § 1341, and § 1343**

To support a conspiracy conviction, the government must establish: (1) the existence of

an agreement to violate the law, (2) that the defendant knowingly and willfully joined the

agreement, and (3) that a conspirator committed an overt act in furtherance of the agreement.

*See United States v. Fisher*, 648 F.3d 442, 448 (6th Cir. 2011). Count 1 of the superseding

indictment charges conspiracy to commit mail and wire fraud. *See* 18 U.S.C. §§ 1341, 1343.

The elements of mail fraud and wire fraud are essentially the same, "the only difference being

that a wire communication, e.g., telephone call, is required instead of a mailing." *United States

v. Bibby*, 752 F.2d 1116, 1126 (6th Cir. 1985). A conviction requires proof that the defendant

devised or willfully participated in a scheme or artifice to defraud, using the mails or a wire

communication in furtherance of the scheme, with the intent to deprive a victim of money or

property. *See United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010); *United States v.

Frost*, 125 F.3d 346, 354 (6th Cir. 1997). "A scheme to defraud includes any plan or course of

action by which someone intends to . . . deprive another by deception of money or property by

means of false or fraudulent pretenses, representations, or promises." *United States v. Daniel*,

329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Gold Unlimited, Inc.*, 177 F.3d 472,

479 (6th Cir. 1999)). To establish a scheme to defraud, the government must prove that the

defendant made a *material* false statement or omission, i.e., a statement or omission "that would

have affected a reasonable person's actions in the situation." *Id.* But the government need not

prove "that the intended victim was actually defrauded; the actual success of a scheme to defraud

is not an element of either § 1341 or § 1343." *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994).

Barkus argues that the evidence was insufficient to support his conviction under Count 1 because the government failed to show that Helfgott agreed to participate in the alleged conspiracy, and thereby failed to establish that venue was proper and to prove the existence of an agreement more generally. I disagree. Helfgott testified that "it's not really the way a trust account should be used," but he agreed with Barkus to use his IOLTA to help Barkus manage his finances and deal with creditors. (PID 7005, 6980) Helfgott testified that he received wires and checks into his IOLTA and disbursed the money placed in the account at Barkus's direction, and sometimes Lombardo's, and it was "used primarily to pay expenses, personal expenses of Mr. Barkus and Mr. Lombardo, or pay directly to them." (PID 6982). Helfgott processed deposits into the IOLTA from, inter alia, investors Joan LaCount, James Brundidge, Brigitte Cunningham, and Anna Szczepanski, each of whom testified that they believed their funds represented an "investment," not a personal loan. (PID 8548-49 La Count; PID 7489-90, 7158 Brundidge; PID 7856, 7859 Szczepanski; PID 7917-21 Cunningham.) The government also introduced evidence that Helfgott himself solicited investors. Specifically, Helfgott contacted Samuel Robinson, whom he knew through a mutual friend. Robinson testified that Helfgott asked, on Barkus's behalf, for $60,000 in "bridge financing" to help put together a company that would be involved in "developmental projects overseas" in Indonesia and "a lot of other countries." (PID 7508-09.) Helfgott promised Robinson that he would receive $90,000 on his $60,000 investment after ninety days. (PID 7509, PID 7148.) Robinson wired the money to Helfgott's IOLTA and received a promissory note signed by Barkus. (PID 7511-12, 7158.) Helfgott testified that Robinson's money was thereafter disbursed at Barkus's direction but was

not used to finance the project associated with Robinson's loan. (PID 7148) The ninety days passed without payment to Robinson. When Robinson persisted in requests for repayment, Helfgott solicited funds totaling $70,000 from Brundidge (PID 7489-90), characterizing the money as an investment (PID 7157-58). Helfgott deposited the money from Brundidge into the IOLTA and Barkus used the money from Bunbridge to pay Robinson. PID 7158; 9121. A rational juror could infer from this evidence the existence of an agreement to commit mail and wire fraud, that Helfgott knowingly participated in the agreement, and that in disbursing funds related to Robinson's and Bunbridge's investments, Helfgott committed an overt act in furtherance of the conspiracy in the Northern District of Ohio.

Lombardo contends that insufficient evidence supports his conviction under Count I because the government failed to prove that he agreed to participate in or knowingly joined the conspiracy, and failed to prove that he committed an overt act. As to Lombardo's overt-act argument, the government need not prove that *each* participant in a conspiracy committed an overt act; it need only prove that one or more of the conspirators did so. *See* 18 U.S.C. § 317. Lombardo's sufficiency argument also fails. Helfgott testified that the funds in the IOLTA were used primarily for Barkus's and Lombardo's personal expenses and testified to making multiple disbursements from the IOLTA to the PCF account, on which Lombardo was a signatory; Special Agent Dever testified that Lombardo and Barkus personally received approximately equal amounts of money over the course of the conspiracy, about $500,000, through the PCF and IOLTA accounts (PID 9097). Lombardo contends that although he received money from Barkus, his receipt of funds does not connect him to the scheme because there is no evidence that he knew how Barkus obtained the funds. But Francis Buckley testified that Lombardo showed him a check for $50,000 from an investor in AuraSoothe and stated that he planned to use the

money to buy a ring for his wife. (PID 7977)  And Victor Rothgarn testified that he met Barkus

and invested in AuraSoothe through Lombardo.  Rothgarn twice invested $50,000 in return for

one-percent interests in AuraSoothe.  He made his first check payable to the PCF account,

writing "loan" in the memo line at Lombardo's direction although he considered the money an

investment.  (Rothgarn Dep. 15-16)  When Barkus solicited the second $50,000 investment from

Rothgarn, Rothgarn wired funds directly to the IOLTA.  A rational juror could infer from the

evidence that Lombardo was aware of the manner in which the IOLTA was being used, as well

as the money wired into it,  and willingly participated in the scheme to defraud.

## II.      Count 6:  Conspiracy to defraud the United States in violation of 18 U.S.C. § 371

Count VI charged Barkus and Lombardo with a *Klein* conspiracy, i.e., with conspiring

"to defraud the United States by deceitful and dishonest means for the purpose of impeding,

impairing, obstructing, and defeating the lawful government functions of the [I.R.S] in the

ascertainment, computation, and collection of taxes owing."  *See United States v. Sturman*, 951

F.2d 1466, 1472 (6th Cir. 1991) (citing *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957)).  To

prove a *Klein* conspiracy, the government must establish: (1) the existence of an agreement to

defraud the United States, (2) that the defendant knowingly and willfully joined the agreement,

and (3) that a conspirator committed an overt act in furtherance of the agreement.  *See United*

*States v. Fisher*, 648 F.3d 442, 448 (6th Cir. 2011).

Barkus contends that insufficient evidence supports his conviction under Count 6 because

the government did not prove that Helfgott knew of Barkus's 1993 tax lien, and therefore did not

prove that Helfgott shared the objective to use the IOLTA to obstruct the assessment and

collection of taxes.  But, although Helfgott testified that he did not know of Barkus's tax liability

when he and Barkus first made plans regarding use of the IOLTA, he testified that he

subsequently learned of the lien, knew at the time that placing money in the IOLTA would obstruct the I.R.S.'s assessment and collection efforts, and yet continued to use the IOLTA in the same manner. (PID 6982-83) Barkus points to Helfgott's testimony that he never had a conversation with Barkus during which he explicitly agreed to use the IOLTA to hide money from the I.R.S., but evidence of a formal written or spoken agreement is not required to support a conspiracy conviction; a "'tacit or mutual understanding among the parties' is sufficient." *Fisher*, 648 F.3d at 451 (quoting *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000)). Accordingly, a rational juror could conclude that Helfgott was aware of Barkus's tax lien and shared Count 6's conspiratorial objective.

Lombardo argues that insufficient evidence supports his conviction under Count 6 because, even if Helfgott was aware of Barkus's tax lien, the government failed to introduce evidence showing that Helfgott was aware of *Lombardo's* tax lien. But Helfgott testified that he became aware of *both* Barkus's and Lombardo's tax liens by "at least 2005," and that he was aware that Lombardo and Barkus were business partners and "assumed if one had a lien, the other one did too." (PID 7334-36, 7442-43, 45) Viewing Helfgott's testimony in the light most favorable to the prosecution, a rational juror could conclude that Helfgott was aware of Lombardo's tax liability and, as with Barkus, shared in the agreement to obstruct the I.R.S.'s assessment and collection of Lombardo's tax obligation.

### III. Count 5: Securities Fraud in violation of 15 U.S.C. § 78j(b) and 78ff

Count V charges Barkus and Lombardo with securities fraud. "The offense of securities fraud under 15 U.S.C. § 78j(b) is 'quite similar' to mail fraud 'in that it also calls for proof of a scheme or design to defraud incident to the purchase or sale of a security' and 'the use of an instrumentality of interstate commerce or of the mails in furtherance of that scheme or design.'"

*United States v. Coffman*, Nos. 12-5574, 12-5611, 12-6090, 2014 WL 3673028, at *3 (6th Cir. July 22, 2014) (quoting *United States v. MacKay*, 491 F.2d 616, 619 (10th Cir. 1973)). "Both statutes require a specific intent to defraud." *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998). To have the requisite intent, "a defendant must knowingly make a material misrepresentation or knowingly omit a material fact," and "the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *Id.*

The parties' arguments regarding securities fraud focus on Victor Rothgarn's investment. Barkus and Lombardo contend that Rothgarn's investment does not support their securities-fraud convictions. They point to Rothgarn's testimony that he saw bottles of AuraSoothe lotion, he spoke with Lombardo regarding Lombardo's efforts to market the product, Lombardo never asked him to fund other ventures or to do anything illegal, and Rothgarn believed he had made a bad business decision. This testimony does not undermine the verdict; a rational juror could nonetheless conclude that Barkus and Lombardo made material misstatements to Rothgarn to induce him to invest. Rothgarn purchased his first one-percent share in AuraSoothe in February 2004 for $50,000. As noted, Helfgott testified that although Rothgarn's purchase agreement stated that Rothgarn was purchasing the shares from a "trust," no trust related to AuraSoothe existed at the time or was ever established. (PID 7127-29) In October 2004, Rothgarn purchased a second one-percent share in AuraSoothe. He did so "hesitantly" because he did not have the money on hand and would have to withdraw funds from his 401(k), but Barkus was "adamant" that he invest, Lombardo assured him that the investment was a "for-sure thing," and he was told that his money would "double." (Rothgarn Dep 29, 67, 85.) He made the investment only after agreeing with Barkus and Lombardo that he could receive $20,000 back

- 39 -

upon request at any time to reimburse his 401(k). (Rothgarn Dep. 32-33) When he did subsequently request the $20,000, however, he received only two checks of $5000 each, and only after pushing for repayment. (Rothgarn Dep. 71.) Moreover, Rothgarn's initial purchase agreement stated that that if he asked to withdraw his investment between twelve to fourteen months after purchasing his share, he would receive a $60,000 repayment on his $50,000 investment, but Rothgarn testified that he did not exercise that right because he "kept being told that this thing is going to be big, we're just months away, you're going to double your money." (Rothgarn Dep. 118.) Several times Barkus and Lombardo made representations that a sale of the company was "right around the corner," and that "everything was going as planned," but no sale ever materialized and Rothgarn never recovered his investment. (Rothgarn Dep 77-78.) Special Agent Dever testified that funds from Rothgarn, and funds in AuraSoothe's accounts generally, were transferred to Lombardo's and Barkus's personal bank accounts and used to pay personal expenses. (*See* PID 9162-9166, 9180-81; 7256.) Drawing all inferences in the government's favor, a rational juror could conclude that Barkus and Lombardo knowingly made false promises of profits and repayment to Rothgarn to induce him to invest in AuraSoothe.

IV. **Counts 8, 10, 11, 14, and 15: Tax evasion in violation of 26 U.S.C. § 7201 (Lombardo)**

The elements of tax evasion are "willfulness; the existence of a tax deficiency; and an affirmative act constituting an evasion or attempted evasion of the tax." *United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008) (quoting *United States v. DeNiro*, 392 F.2d 753, 758 (6th Cir. 1968)). Count 8 of the indictment charges Lombardo with tax evasion arising from the calendar year 1993. Specifically, the indictment alleges that Lombardo evaded payment of taxes in 1993, and then after the I.R.S. lodged the tax lien against him in 2000, evaded collection through use of

the IOLTA, by using corporate names to conceal assets, by filing false tax returns in 2001 and 2002, and by filing a fraudulent bankruptcy petition. Counts 10, 12, 14, and 15 charge Lombardo with evading assessment of taxes owed in the tax years 2003, 2004, 2005 and 2006 by failing to file income tax returns as required by law and by using the IOLTA to pay personal expenses and using corporate names to hide assets. Count 14 includes the additional allegation that Lombardo evaded taxes by filing a fraudulent bankruptcy petition.

Regarding Count 8, Lombardo alleges that the government failed to introduce sufficient evidence that he willfully attempted to evade payment of taxes. Rather, Lombardo contends, the evidence shows mere delay in the payment of taxes which is not criminal under § 7201. *See Edwards v. United States*, 375 F.2d 862, 867 (9th Cir. 1967). In support of his contention that he was not attempting to evade payment, Lombardo points to evidence that he consulted tax professionals during the appeal of the audit of his 1993 return, and he submitted an offer in compromise on the 2000 tax lien, to which he did not receive a response. In February 2004, he withdrew the offer in compromise, and almost two years later, after suffering a stroke, Lombardo filed for bankruptcy, listing the I.R.S. as a creditor holding a tax lien of $1,220,724.64. The bankruptcy court ordered the debt discharged.

As the government contends, however, the described conduct is not inconsistent with a determination that Lombardo attempted to evade payment: filing the offer in compromise suspended the I.R.S.'s collection efforts, and listing the I.R.S. as a creditor in the bankruptcy petition offered Lombardo the opportunity to discharge the debt entirely. More importantly, the jury also heard Helfgott's and Special Agent Dever's testimony that Lombardo received funds totaling over $500,000 from the IOLTA from 2001 through 2006, and I.R.S. officers Kristy Morgan and Gregory Yurick testified that Lombardo did not disclose the receipt of these funds to

the I.R.S. or in his bankruptcy petition, and his bankruptcy petition did not disclose any ownership or membership interest in Timbertop or AuraSoothe, any status as an officer of those entities, his status as a signatory on the PCF account, or the receipt of any personal loans. (PID 5745-47; 8747-69)  This evidence, combined with Lombardo's failure to file tax returns in the tax years related to Counts 10, 12, 14, and 15, supports Lombardo's conviction of each of the tax-evasion charges.